

# NUMBER 13-15-00037-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**ALBERTO ALBA VILLARREAL,**        **Appellant,**

**v.**

**THE STATE OF TEXAS,**        **Appellee.**

**On appeal from the 445th District Court
of Cameron County, Texas.**

# OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Opinion by Justice Rodriguez**

Appellant Alberto Alba Villarreal was charged on November 6, 2013 with one count of securities fraud (Count I), *see* TEX. REV. CIV. STAT. ANN. art. 581-29(C) (West, Westlaw through 2015 R.S.), and one count of theft by deception (Count II). *See* TEX. PENAL CODE ANN. § 31.03(e)(7) (Westlaw, West through 2015 R.S.). The jury found Villarreal guilty of both counts and sentenced him to ten years for Count I and five years for Count II, with

the sentences to run concurrently. Villarreal's ten-year sentence was suspended, and he was placed on community supervision for ten years.

By eighteen issues, Villarreal contends: (1) the convictions are void because they were prosecuted by the Texas Securities Board (TSB), which Villarreal claims is a violation of constitutional separation of powers; (2–3) subsections (1) and (3) of article 581-29(C) of the Texas Revised Civil Statutes (the Texas Securities Act or TSA) are unconstitutional because they assign criminal penalties to ordinary negligence; (4–5) the trial court erred in denying Villarreal's motion to dismiss because the statute of limitations had expired on both counts; (6–7) the evidence was insufficient to sustain a conviction on each count; (8) the securities fraud count failed to state an offense; (9) the trial court erred in denying Villarreal's request for the inclusion of the statutory exception in the jury charge; (10–11) a material variance existed between the indictment allegations for each count and the proof at trial; (12) the prosecutor engaged in misconduct when she gave advice to the complainant regarding his civil suit against Villarreal; (13) the trial court erred in permitting the TSB to act as prosecutors and witnesses in this case; (14) the trial court erred in not striking the complainant's testimony and failing to grant a mistrial when the State did not produce the complainant's videotaped statement; and (15–18) the trial court improperly commented on the State's evidence, causing egregious harm.

We affirm Villarreal's conviction for theft by deception (Count II). We reverse and render a judgment of acquittal on Villarreal's conviction for securities fraud (Count I).

## I. BACKGROUND

This case involves Villarreal and the complainant Enrique Garrido Cruz (Garrido). It is undisputed that both men came from "humble beginnings" in Mexico to become

successful business owners—Villarreal in the insurance industry and Garrido in the auto parts business. Villarreal planned to form Nafta Holdings, L.L.C., an insurance company. Garrido wanted to diversify and go into the insurance business with Villarreal.

The evidence reveals that on November 3, 2008, Villarreal and Garrido entered into a company agreement (the Agreement) that formed Nafta Holdings. The Agreement set out that its effective date was November 3, 2008, and pursuant to the Agreement, each party committed $2,000,000 to the company. By November 7, 2008, Garrido had deposited $1,000,000 into a venture account at Wells Fargo Bank (Wells Fargo), where both Villarreal and Garrido were signatories on the account. And on November 7, 2008, Garrido received a 24% membership interest in Nafta Holdings. Trial testimony discussing a bank record review and an exhibit further revealed that sometime after November 13, 2008, almost $1,000,000 was transferred from Wells Fargo into an account at First National Bank (First National) where Villarreal was the only authorized signatory.

According to the testimony at trial, in June 2009, Garrido, who was concerned about the "health" of the company, asked Villarreal for an accounting before he invested the second $1,000,000. Villarreal provided Garrido with a list of expenses totaling $1,196,557.78. It is undisputed that Garrido did not invest his remaining $1,000,000 commitment and that Villarreal did not invest any of his $2,000,000 commitment. Garrido and Villarreal's relationship continued for approximately four years after Garrido made his initial investment.

It is also undisputed that Villarreal unsuccessfully sued First National after he had deposited the Nafta Holdings funds with it and after First National refused to release those

3

funds.   In December 2011, when Villarreal had returned none of Garrido's money, Garrido hired an attorney to file a complaint against Villarreal with the TSB.

Villarreal was indicted for securities fraud and theft by deception on November 6, 2013.[1]   Sometime before the November indictment, Garrido filed a civil lawsuit against Villarreal.[2]

The trial in this case began on January 5, 2015, and the jury found Villarreal guilty of securities fraud and of theft by deception.   It sentenced Villarreal to ten years and five years respectively, in the Institutional Division of the Texas Department of Criminal Justice, with the sentences to run concurrently.   Villarreal's ten-year sentence was suspended, and he was placed on community supervision for ten years.   This appeal followed.

## II.   SPECIAL PROSECUTORS

By his first issue, Villarreal asserts a separation-of-powers challenge.   He contends that the trial court erred when it denied his challenge to the District Attorney's appointment of special prosecutors who worked for the TSB at the time.   He claims that special prosecutors from the executive branch prosecuted his case and not the District Attorney from the judicial branch, and therefore, his convictions are void.   The State

---

[1] The grand jury indicted Villarreal on August 28, 2013; however, as the State explains in its appellate brief, "the State decided to later indict [Villarreal] with additional and different statutory language on November 6, 2013."   A copy of the August indictment does not appear in the appellate record for our review, and the State does not contend that the August indictment tolled the statute of limitations for the November indictment.   See Tita v. State, 267 S.W.3d 33, 35 (Tex. Crim. App. 2008) (providing that a prior indictment tolls the statute of limitations for a subsequent indictment when both indictments allege the same conduct, same act, or same transaction).

[2] The outcome of the civil lawsuit, which is unclear from our review of the record, is not relevant to our analysis of the issues in this appeal.

4

responds that the trial court did not err in denying Villarreal's challenge because Cameron County's District Attorney retained ultimate control and authority over Villarreal's prosecution and because Texas law recognizes a district attorney's discretion to appoint attorneys to serve as special prosecutors without violating the separation-of-powers provision of the Texas Constitution. We agree with the State.

## A. Applicable Law

### 1. Separation-of-Powers Doctrine

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

TEX. CONST. art. 2, § 1. This separation-of-powers doctrine prohibits one branch of government from exercising a power that inherently belongs to another. *See id.*; *see also Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 600 (Tex. 2001); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993).

To establish a violation of separation of powers under the Texas Constitution, a defendant must show (1) that one department has assumed, or has been delegated, to whatever degree, a power that is more "properly attached" to another, or (2) that one department has so unduly interfered with the functions of another that the other department cannot effectively exercise its constitutionally assigned powers. *State v. Williams*, 938 S.W.2d 456, 458 (Tex. Crim. App. 1997) (quoting *Armadillo Bail Bonds v. State*, 802 S.W.2d 237, 239 (Tex. Crim. App. 1990)); *Medrano v. State*, 421 S.W.3d 869, 877 (Tex. App.—Dallas 2014, pet. ref'd); *Wilkerson v. State*, 347 S.W.3d 720, 724 (Tex.

App.—Houston [14th Dist.] 2011, pet. ref'd); *see also Ex parte Perry*, 483 S.W.3d 884, 894–95 (Tex. Crim. App. 2016). "The first type of violation has to do with a usurpation of one branch's powers by another branch. The second type has to do with the frustration or delay of one branch's powers by another branch." *Rushing v. State*, 50 S.W.3d 715, 723 (Tex. App.—Waco 2001) (op. on reh'g), *aff'd*, 85 S.W.3d 283, 287 (Tex. Crim. App. 2002). As applied in this case, the doctrine would be violated if the functioning of the judicial process in a field constitutionally committed to the control of the judicial branch is assumed by or delegated to the executive branch or is interfered with by the executive branch. *See Little-Tex Insulation Co.*, 39 S.W.3d at 600; *State Bd. of Ins. v. Betts*, 158 Tex. 83, 308 S.W.2d 846, 851–52 (1958); *see In re Dean*, 393 S.W.3d 741, 747–48 (Tex. 2012); *Hightower v. Baylor Univ. Med. Ctr.*, 348 S.W.3d 512, 522 (Tex. App.—Dallas 2011, pet. denied). The separation-of-powers doctrine requires that "any attempt by one department of government to interfere with the powers of another is null and void." *Meshell v. State*, 739 S.W.2d 246, 252 (Tex. Crim. App. 1987) (en banc); *Medrano*, 421 S.W.3d at 877–79.

### 2. The Texas Securities Act

The TSA provides for its administration and enforcement as follows:

The administration of the provisions of this Act shall be vested in the Securities Commissioner. It shall be the duty of the Securities Commissioner and the Attorney General to see that its provisions are at all times obeyed and to take such measures and to make such investigations as will prevent or detect the violation of any provision thereof. The Commissioner shall at once lay before the District or County Attorney of the proper county any evidence which shall come to his knowledge of criminality under this Act. In the event of the neglect or refusal of such attorney to institute and prosecute such violation, the Commissioner shall submit such evidence to the Attorney General, who is hereby authorized to proceed therein with all the rights, privileges and powers conferred by law upon

6

district or county attorneys, including the power to appear before grand juries and to interrogate witnesses before such grand juries.

TEX. REV. CIV. STAT. ANN. art. 581-3 (West, Westlaw through 2015 R.S.). Villarreal identifies the TSB as an executive-branch agency.[3] *See S. Canal Co. v. State Bd. of Water Eng'rs*, 311 S.W.2d 938, 941 (Tex. Civ. App.—Austin 1958) (per curiam), *aff'd*, 318 S.W.2d 619, 626 (1958) ("The administration of laws belongs to the executive branch of government.").

### 3.    The District Attorney

Article 2.01 of the code of criminal procedure discusses the duties of district attorneys:

> [Each district attorney] shall represent the State in all criminal cases in the district courts of his district . . . except in cases where he has been, before his election, employed adversely. . . . It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done.

TEX. CODE CRIM. PROC. ANN. art. 2.01 (West, Westlaw through 2015 R.S.). The offices of district attorney are in the judicial branch of government. *Saldano v. State*, 70 S.W.3d 873, 876 (Tex. Crim. App. 2002) (en banc) (explaining that the constitution gives authority to prosecute criminal cases to county attorneys, criminal district attorneys, and district attorneys, under regulation of legislature, which has regulated duties of district attorneys and county attorneys by giving them authority to prosecute criminal cases); *Meshell*, 739 S.W.2d at 254 (recognizing that along with various civil duties, the primary function of the

---

[3] The Attorney General is in the executive branch, although he has, among other things, legislative authority to represent the State in district court in certain instances. *See* TEX. CONST. art. IV, §§ 1, 22; *Saldano v. State*, 70 S.W.3d 873, 879 (Tex. Crim. App. 2002); *Medrano v. State*, 421 S.W.3d 869, 877–79 (Tex. App.—Dallas 2014, pet. ref'd). We will assume for the purposes of this opinion that the TSB is also part of the executive branch, as Villarreal asserts.

county and district attorney is "to prosecute the pleas of the state in criminal cases"); *see* TEX. CONST. art. V, § 21; *see also id.* art. V, § 1 (vesting the judicial power of the State in the courts).

### 4. Special Prosecutor[4]

The district attorney may enlist a special prosecutor to help in a particular case, but the special prosecutor is not a member of the district attorney's regular staff. *Coleman v. State*, 246 S.W.3d 76, 82 n.19 (Tex. Crim. App. 2008).

> A "special prosecutor," with the consent of the district attorney, assists the district attorney in the investigation and prosecution of a particular case, but the district attorney is responsible for the prosecution, control and management of the case." *State v. Rosenbaum*, 852 S.W.2d 525, 529 (Tex. Crim. App. 1993) (Clinton, J., concurring) [(en banc)]; *see Rogers v. State*, 956 S.W.2d 624, 625 n.1 (Tex. App.—Texarkana 1997, pet. ref'd). The "special prosecutor" need not be appointed by the trial court and is not required to take the constitutional oath of office where he acts with the permission of the district attorney. *See Rosenbaum*, 852 S.W.2d at 529 n.2 (Clinton, J., concurring); *Lopez v. State*, 628 S.W.2d 77, 80 (Tex. Crim. App. 1982); *Reed v. State*, 503 S.W.2d 775, 776 (Tex. Crim. App. 1974); *Lopez v. State*, 437 S.W.2d 268, 269 (Tex. Crim. App. 1968).

*Stephens v. State*, 978 S.W.2d 728, 731 (Tex. App.—Austin 1998, pet. ref'd); *see Haywood v. State*, 344 S.W.3d 454, 461–62 (Tex. App.—Dallas 2011 pet. ref'd) ("[A] 'special prosecutor' is an attorney who is not a part of the district attorney's office but is enlisted to assist the district attorney in a particular case."). Importantly, we do not determine control of the prosecution "according to quantitative analysis or by simply looking at who was lead counsel at trial; in fact, for tactical reasons, a [district] attorney can give substantial portions of the conduct at trial to a particularly skilled assistant without

---

[4] A special prosecutor is different from an attorney pro tem. *See* TEX. CODE CRIM. PROC. ANN. art. 2.08 (West, Westlaw through 2015 R.S.). This opinion is limited in scope to special prosecutors.

relinquishing control." *Hartsfield v. State*, 200 S.W.3d 813, 817 (Tex. App.—Texarkana 2006, pet. ref'd) (citing *Faulder v. Johnson*, 81 F.3d 515, 517–18 (5th Cir. 1996)).

## B. Analysis

In support of his position, Villarreal argues that "the prosecution by the [TSB] step[ped] squarely outside fundamental constitutional bounds by charging and prosecuting a criminal case. The authority of the [TSB], in the executive branch, is expressly limited to investigation functions" and "not to [the] prosecut[ion of] investigated individuals." Villarreal claims that as special prosecutors, the TSB lawyers, Melanie Good and Angela Cole, violated separation of powers by assuming control of the prosecution of his case. In particular, Villarreal alleges that the TSB lawyers took several actions, which showed that they had unlawfully assumed control of his prosecution "usurping the duties of the District Attorney:" testifying before the grand jury, drafting his indictment, and directing voir dire and other pretrial proceedings.[5] Villarreal contends that these actions constitute a violation of separation of powers of the first type under *Williams* in that the TSB attorneys, who were special prosecutors in this case, assumed or were delegated the power to prosecute Villarreal. *See* 938 S.W.2d at 458. We must determine then whether the TSB attorneys usurped the District Attorney's constitutional or statutory powers. *See id.*; *Rushing*, 50 S.W.3d at 723.

### 1. Testimony before the Grand Jury

---

[5] Villarreal also complains that the special prosecutors were either designated as expert witnesses or appeared as trial witnesses. But such designation or appearance is not relevant to our determination of Villarreal's separation-of-powers argument. *See* Tex. R. App. P. 47.1. We will address his complaints regarding TSB attorneys as witnesses in a separate issue.

9

Villarreal first asserts that individuals from the TSB assumed control of the prosecution of the case by testifying before the grand jury. However, we find no support in the record for this contention. During an April 23, 2014 pre-trial hearing on Villarreal's motion for the grand jury transcript, Julie Allen, an Assistant District Attorney from Cameron County, informed the trial court that her review of the "Grand Jury Minute Book" revealed that no witnesses testified before the first grand jury on August 28, 2013 or at the later hearing. Instead, she reported that the grand jury was presented records from the TSB investigation on the matter and that "[i]t was based on the evaluation of those accounts and the investigative reports." Furthermore, during a discussion before the bench at a pre-trial motion hearing on December 12, 2014, Cole reiterated, "I didn't testify at either grand jury." Finally, according to our review of the record, the court also requested that Allen determine whether anyone testified at the grand jury hearing. And later that afternoon, a Cameron County Assistant District Attorney, who was "in charge of [i]ntake and the presentation of cases to the Grand Jury," filed an affidavit, stating that he "examined the Grand Jury Minutes Book" and found that no live testimony was taken during the Grand Jury presentation for Villarreal's case.

### 2. The Indictment

Villarreal further asserts that, based on representations made by counsel at the April 23, 2014 hearing, a TSB lawyer assumed control of the prosecution when the TSB "prepared the wording of the indictment." But our review of the transcript for this pre-trial hearing shows that while Allen was explaining to the trial court why the District Attorney's Office decided to re-indict Villarreal, she said, "[T]his case was re[-]presented to correct the [indictment] language because [a TSB attorney] didn't like the original wording of the

indictment, so it was re[-]presented with the same facts." We disagree that this explanation shows that the TSB attorneys presented the case. Instead, the concern about the language of the indictment suggests that because they did not like the indictment's original wording, the TSB attorneys were not involved in the original decision of whether or not to prosecute Villarreal.

### 3. Pretrial Proceedings

In support of his argument, Villarreal next directs us to Allen's reference to the TSB attorneys as "kind of a lead prosecutor in this case." Villarreal contends that this comment shows that the TSB attorneys had assumed control over pretrial proceedings.

It is undisputed that approximately two weeks before trial the Cameron County District Attorney exercised his authority to appoint TSB attorneys Good and Cole as special prosecutors in this case. *See Coleman*, 246 S.W.3d at 82 n.19; *Stephens*, 978 S.W.2d at 731; *Haywood*, 344 S.W.3d at 461–62. At a December 12, 2014 pretrial motion hearing, when the trial court asked Allen why she was bringing in a special prosecutor, Allen explained that

> [i]t is their case, but they investigated—the [TSB] investigated it. It's a very complicated case, and it requires specialists and this is the type of case that they try. And so just like the Attorney General's office takes special cases, that's why the Securities Board is kind of a lead prosecutor in this case just because these are the types of cases that they try.

It is apparent from the context of the challenged comment that by making this remark Allen was not admitting that TSB attorneys were serving as lead prosecutors, as Villarreal contends. Instead, Allen was explaining her tactical reasons for enlisting TSB's attorneys: relying on their expertise to assist with the trial's specialized subject matter. *See Stephens*, 978 S.W.2d at 731; *Haywood*, 344 S.W.3d at 561–62. Moreover, our

11

review of the record does not bear out Villarreal's claim that TSB controlled pretrial proceedings. Rather, Allen, from the District Attorney's office, appeared for the State at pre-trial hearings, and Allen's name appears on most, if not all, of the State's pre-trial pleadings. *See Hartsfield*, 200 S.W.3d at 817. Allen also appeared at all trial proceedings along with Good and Cole. And Allen explained to the trial court why the District Attorney had, for tactical reasons, given Good and Cole substantial portions of the conduct at trial. *See Hartsfield*, 200 S.W.3d at 817 (noting that we do not determine control of the prosecution by looking at who is identified as lead counsel at trial).

### 4. Voir Dire

Villarreal also claims that the TSB assumed control of the prosecution during jury selection. However, the trial court informed the jury panel that the State was represented by the District Attorney's office—"Ms. Allen." It then asked Allen to introduce co-counsel, which she did. Allen introduced Cole and Good "[f]rom Corpus Christi, the Texas Securities Board." Allen began the State's voir dire and discussed the theft-by-deception charge. Good then continued voir dire, describing securities fraud and how "the Texas Securities Act provides methods of enforcement by taking action against individuals and companies who violate the Act including criminal actions." Good continued, "That's why we're here today." Based on this last statement, Villarreal asserts that the special prosecutor "informed the jury that it was she and the [TSB] that brought the indictment." We disagree. Good spoke collectively to the potential jurors and explained that they were there because the Act provides for criminal actions to be taken against individuals or companies that violate the Act. We cannot conclude that by this statement Cole was telling the jury that she and the TSB brought the indictment, as Villarreal argues.

12

### 5. The Trial

It is undisputed that Allen was present and participated with the special prosecutors throughout the trial. *See State ex rel. Hill v. Pirtle*, 887 S.W.2d 921, 924 (Tex. Crim. App. 1994) (en banc) (giving weight to the fact that permanent members of the district attorney's staff remained involved in the prosecution and had been present during the grand jury hearings); *see also Davis v. State*, 188 S.W.2d 397, 399–400 (Tex. Crim. App. 1945) (per curiam) ("The bill upon its face shows that an Assistant District Attorney was present, took part in the trial of the case, and directed the prosecution. The bill fails to disclose any act which the special prosecutor did that was improper or was done without the consent or approval of the Assistant District Attorney."). Allen is also identified as one of the attorneys appearing on behalf of the State in the trial court reporter's record that is filed in this appeal.

### 6. Summary

Allen's participation in pre-trial hearings and voir dire, and her continual presence throughout the trial, clearly demonstrate that the Cameron County District Attorney maintained ultimate supervisory authority over Villarreal's prosecution. The District Attorney appointed the TSB attorneys, who were particularly skilled in the area of securities fraud, to assist him in the prosecution of this case, and to take the lead in certain portions of the trial. *See Pirtle*, 887 S.W.2d at 924; *Hartsfield*, 200 S.W.3d at 817. We cannot conclude that anything in the record suggests that Good and Cole assumed the judicial branch's power in this case. *See Williams*, 938 S.W.2d at 458. Instead, Villarreal's separation-of-powers claim is without foundation because there is no indication the TSB attorneys exceeded their constitutional or statutory authority. *See id.*

13

Moreover, we cannot conclude that Allen relinquished a constitutional or statutory duty, yielded control of this case, or delegated a power to the executive branch that was more properly attached to the District Attorney's office. *See id.* The district attorney simply gave substantial portions of the conduct at trial to particularly skilled assistants without relinquishing control. *See Hartsfield*, 200 S.W.3d at 817.

Based on the above analysis, we conclude that the appointment of special prosecutors Good and Cole did not amount to a violation of the separation-of-powers provision of the Texas Constitution and that the trial court did not abuse its discretion in denying Villarreal's challenge to the special prosecutor's appointments. We overrule Villarreal's first issue.

### III. CONSTITUTIONALITY OF ARTICLE 581-29(C)(1)

By his third issue, Villarreal contends that article 581-29(C)(1) of the Act is unconstitutional on its face because it assigns criminal penalties to ordinary negligence in violation of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.[6] *See* TEX. REV. CIV. STAT. ANN. art. 581-29(C)(1). In response, the State

---

[6] In his second issue, Villarreal challenges the constitutionality of article 581-29(C)(3), which is referenced in the caption of the indictment. *See* TEX. REV. CIV. STAT. ANN. art. 581-29(C) (West, Westlaw through 2015 R.S.). But the law is clear that the caption of an indictment is not part of the charging instrument; when the caption lists a different offense from the one alleged in the body of the indictment, as in this case, the body of the indictment controls. *See, e.g., Stansbury v. State*, 128 Tex. Crim. 570, 574, 82 S.W.2d 962, 964 (1935) (per curiam); *Steadman v. State*, 160 S.W.3d 582, 585 n.3 (Tex. App.—Waco 2005, pet. ref'd); *Jackson v. State*, 880 S.W.2d 432, 433 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) (applying same rule to information); *see also* 42 GEORGE E. DIX & JOHN M. SCHMOLESKY, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 25.24 (3d ed. 2011) ("If . . . the caption identifies the charged offense as one different than what is actually charged in the charging instrument proper, this is of no significance. It does not constitute a defect in the charging instrument, nor does it give rise to some sort of fatal variance when the proof at trial shows the offense charged in the instrument proper rather than the offense specified by name in the caption."). Here, the language of Count I specifically tracks the language of article 581-29(C)(1). *See* TEX. REV. CIV. STAT. ANN. art. 581-29(C)(1). The State alleged that Villarreal committed fraud in connection with the sale of a security—a membership in NAFTA Holdings—by "[i]ntentionally failing to disclose . . . [certain] material fact[s]" and by "[i]ntentionally and knowingly misrepresenting . . . [certain] relevant fact[s]." *See id.* It is clear that the indictment charged Villarreal under article 581-29(C)(1) and

14

argues that article 581-29(C)(1) is constitutionally valid because, among other things, it contains the requisite criminal intent elements.

"The [TSB] was enacted to regulate the sale of securities and to protect the public from fraud by persons engaged in selling securities." *Head v. State*, 299 S.W.3d 414, 425 (Tex. App.—Houston [14 Dist.] 2009, pet. ref'd). Article 581-29, entitled "Penal Provisions," provides, in relevant part, the following:

> Any person who shall . . . in connection with the sale, offering for sale or delivery of, the purchase, offer to purchase, invitation of offers to purchase, invitations of offers to sell, or dealing in any other manner in any security or securities, whether or not the transaction or security is exempt under section 5 or 6 of this Act, . . . directly or indirectly . . . engage in any fraud or fraudulent practice[,] is guilty of a felony of the first degree, if the amount involved is $100,000 or more.

TEX. REV. CIV. STAT. ANN. art. 581-29(C)(1). In other words, "[a]rticle 581-29(C)(1) prohibits the use of fraud or fraudulent practices in connection with the sale or offer of securities." *Bridwell v. State*, 804 S.W.2d 900, 903 (Tex. Crim. App. 1991) (en banc). Article 581-4(F) defines "fraud" and "fraudulent practice" as, among other things, "any misrepresentations, in any manner, of a relevant fact" or "an intentional failure to disclose

---

not article 581-29(C)(3). *See id.* Therefore, we need not address Villarreal's constitutionality challenge brought by his second issue.

By his eleventh issue, Villarreal further claims that there is a material variance between Count I of the indictment, titled "False Statement Securities 581-29(C)(3)," and the proof presented at trial, which was for a violation of article 581-29(C)(1). Having determined that Villarreal was properly indicted under article 581-29(C)(1), we need not address his material variance argument as it is not dispositive. *See* TEX. R. APP. P. 47.1. In addition, Villarreal argues that, because of the variance, he was not provided adequate notice of the offense with which he was charged and was subject to double jeopardy. We are not persuaded by Villarreal's lack-of-notice argument. As set out above, the body of the indictment tracked the language of the statute; thus, it properly set out the elements of article 581-29(C)(1), providing Villarreal with notice of the offense. *See State v. Cordell*, 34 S.W.3d 719, 721 (Tex. App.—Fort Worth 2000, no pet.). Likewise, Villarreal's double jeopardy argument fails because the proof presented at trial was for the same statutory offense alleged in the indictment. We overrule the eleventh issue.

15

a material fact." TEX. REV. CIV. STAT. ANN. art. 581-4(F) (West, Westlaw through 2015 R.S.).

Villarreal complains of the standard by which the Texas Court of Criminal Appeals determines whether an omitted fact is material. In *Bridwell*, the court of criminal appeals found,

> that the Supreme Court's definition of "materiality" provides the most objective standard yet applied to securities transactions, and therefore is appropriately applied to interpret "material fact" in connection with articles 581-29(C)(1) and 581-4(F). Restated, an omitted fact is material if there is a substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor, in that it would have been viewed by the reasonable investor as significantly altering the total mix of available information used in deciding whether to invest.

804 S.W.2d at 904. Noting that the *Bridwell* Court relied on a standard from *TSC Industries, Inc. v. Northway, Inc.*, Villarreal asserts that this standard was derived only for civil purposes and only in a civil context, where a reasonable person standard suffices. *See Bridwell,* 804 S.W.2d at 904; *see also TSC Indus., Inc.*, 426 U.S. 438, 449 (1976). He claims that the court of criminal appeals improperly applied this civil standard to a criminal case.

By his arguments, Villarreal is asking us to overrule the holding in *Bridwell* that a reasonable person standard applies when determining whether a fact is material under the Act's penal section. *See* 804 S.W.2d at 903–04. But as an intermediate appellate court, we must follow the binding precedent of the court of criminal appeals. *State v. DeLay*, 208 S.W.3d 603, 607 (Tex. App.—Austin 2006), *aff'd sub nom, State v. Colyandro*, 233 S.W.3d 870, 871 (Tex. Crim. App. 2007); *Gonzales v. State*, 190 S.W.3d 125, 130 n.1 (Tex. App.—Houston [1st Dist.] 2005, pet ref'd). We therefore may not

16

disregard the standard set out in *Bridwell.* *See Moses v. State*, 590 S.W.2d 469, 470 (Tex. Crim. App. 1979); *Ex parte Hartfield*, 442 S.W.3d 805, 817 (Tex. App.—Corpus Christi 2014, pet. ref'd).

Nonetheless, Villarreal argues the United States Supreme Court's recent decision in *United States v. Elonis* requires that we reverse and render a judgment of acquittal on his fraud conviction. *See* 135 S. Ct. 2001, 2008–12 (2015). The *Elonis* decision involved a federal criminal statute that made "it a crime to transmit in interstate commerce 'any communication containing any threat . . . to injure the person of another.'" *Id.* at 2004 (quoting 18 U.S.C. § 875(c)). Because section 875(c) lacked a mental state requirement for the defendant, the Court held that criminal liability could not be imposed merely because a reasonable person would have perceived a communication as a threat; rather, the defendant must have intended to issue the threat or known that the communication would be viewed as a threat. *Id.* at 2012.

We do not find *Elonis* controlling in this case because, unlike in *Elonis*, here article 581-29(C)(1), with its section 4(F) definition, provides for a mental state requirement. *See* Tex. Rev. Civ. Stat. Ann. art. 581-29(C)(1); *id.* art. 581-4(F). Under sections 29(C)(1) and 4(F) of article 581 of the TSA, an individual commits fraud when he *intentionally* fails to disclose a material fact. Tex. Rev. Civ. Stat. Ann. art. 581-29(C)(1); *id.* art. 581-4(F). This is a mens rea requirement that is not present in the federal statute. The *Elonis* Court made clear that it limited its holding to cases where the statute was silent on mens rea. *Elonis*, 135 S. Ct. at 2010. Villarreal has provided no authority that has extended *Elonis*'s holding beyond section 875(c), and we find none. Further, in addition to the statute having a mental state requirement, the *Bridwell* Court adopted the

17

United States Supreme Court's objective standard to determine whether the fact that a person intentionally failed to disclose was material. *See Bridwell,* 804 S.W.2d at 904; *see also TSC Indus.*, 426 U.S. at 449. Villarreal complains of a standard that is not analogous to the one reviewed in *Elonis.* To the extent Villarreal relies on *Elonis*, his reliance is misplaced.

In sum, we are bound by precedent on this subject. *See Bridwell*, 804 S.W.2d at 904; *DeLay*, 208 S.W.3d at 607. The TSA article 581-29(C)(1) does not employ an unconstitutional civil standard of proof; it does not assign criminal penalties to ordinary negligence. *See* TEX. REV. CIV. STAT. ANN. art. 581-29(C)(1). Instead, article 581-29(C)(1) contains the requisite scienter required under the Fifth and Sixth Amendments, now layered with the objective materiality standard. *Id.*; *see id.* art. 581-4(F); *see also Bridwell,* 804 S.W.2d at 904. *Elonis* does not change that determination. *See* 135 S. Ct. at 2008–12. We therefore conclude that the trial court did not apply an unconstitutional civil standard of proof. We overrule Villarreal's third issue.

## IV. STATUTE OF LIMITATIONS

In his fourth and fifth issues, Villarreal contends that the trial court erred by denying his motion to dismiss both counts because the statute of limitations had expired on the securities offense and the theft-by-deception offense.[7]

### A. Relevant Background Facts

On November 3, 2008, Villarreal and Garrido entered into the Agreement. On November 7, 2008, Garrido deposited his money into the Nafta Holdings bank account at

---

[7] Villarreal also claims that because the State neither pleaded nor proved any tolling provision to the statute of limitations, his convictions are void. But Villarreal does not further brief a tolling argument, so to the extent this argument is raised, it is inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

Wells Fargo for a 24% membership interest in the company. Villarreal was indicted for securities fraud and theft by deception on November 6, 2013.

The indictment read, in relevant part, as follows:

> **THE GRAND JURORS**, . . . present that **Alberto Alba Villarreal**, . . . ON OR ABOUT THE **7TH DAY OF NOVEMBER, 2008**, . . . did then and there sell and offer for sale a membership interest in **NAFTA HOLDINGS, LLC**, said membership interest being a security, to wit: an **investment contract and/or an instrument representing or secured by any or all of the capital, property, assets, profits or earning of any company**, to **ENRIQUE GARRIDO** in the amount of **$1,000,000**, and said Defendant committed fraud in connection with the sale of said security by[, among other things]: . . . [i]ntentionally failing to disclose that funds invested by **ENRIQUE GARRIDO** would be used for purposes other than those intended, said information being a material fact . . . . and did then and there unlawfully appropriate, by acquiring or otherwise exercising control over, property, to–wit: **U.S. Currency**, of the value of **$200,000 or more,** from **ENRIQUE GARRIDO**, the owner thereof, without the effective consent of the owner, namely by deception, and with intent to deprive the owner of the property, . . . .

(Emphasis in original.)

The evidence shows that Villarreal, as manager and as a member, and Garrido, as a member, signed the Agreement on November 3, 2008. The Agreement set out that "the Manager has adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date." In the opening paragraph, the Agreement described the effective date as November 3, 2008, when the members signed the Agreement. In addition, the definition paragraph defined "Capital Contribution" as "the amount of money . . . contributed to the Company by a [m]ember." The Agreement defined "Capital Commitment" of a member as "the aggregate amount of capital that such [m]ember has agreed to contribute to the Company." Under section 3.01, the Agreement provided that

19

The persons listed on Exhibit A are hereby Members of the Company, effective contemporaneously with the Effective Date of this Agreement. Set forth opposite the name of each [m]ember listed on Exhibit A is such Member's Capital Commitment and their Percentage Ownership Interest. . . . Each Member represents that the Member is acquiring an interest in the Company for the account of such Member . . . .

Moreover, section 4.01 of the Agreement set out that "[c]ontemporaneously with the execution of this Agreement, each Member shall make or has made the initial Capital Contribution described for the Member in Exhibit A." Section 4.02 continued as follows: "No Member shall be required to make any Capital Contributions other than those specifically described by this Agreement, unless agreed to in writing by the contributing Member or required by the [Texas Business Organizations Code]." Exhibit A to the Agreement identified the members of Nafta Holdings as Villarreal and Garrido. The initial capital contribution and the capital commitment for each member was $2,000,000. For that contribution, Villarreal was to receive 52% interest in the Company and Garrido 48% interest. Exhibit A provided that Garrido "shall tender $1,000,000.00 of his $2,000,000.00 contribution on or before November 7, 2008, at which time he shall be granted a 24% interest in the Company; Enrique Garrido Cruz shall tender an additional $1,000,000.00 to complete his initial capital contribution on or before November 21, 2008, at which time his percentage interest in the Company shall be increased to 48% . . . ."

The evidence further shows that on November 7, 2008, Garrido deposited two checks totaling $1,000,000 into a Nafta Holdings bank account at Wells Fargo. According to his trial testimony, Garrido agreed that he was using these funds to invest in Nafta Holdings. Villarreal and Garrido were signatories on the account. And Eliza Lujan, a financial examiner with the enforcement division of the TSB who reviewed

20

relevant bank records in this case, testified that she "identified $992,648 being transferred [from the Wells Fargo account] to [a] Nafta Holdings, LLC First National Bank account." State's exhibit 27 revealed that the transfer of these funds occurred sometime after November 13, 2008.[8]   Finally, according to Lujan, the only authorized signer on the First National Bank account was Villarreal.

## A.    Standard of Review

We review whether the statute of limitations for an offense has expired prior to the charge under a de novo standard of review.   *See Provident Life & Accident Ins. Co. v. Knot*, 128 S.W.3d 211, 215 (Tex. 2003).   The statute of limitations for each offense at issue in this case is five years.   *See* TEX. REV. CIV. STAT. ANN. art. 581-29-1 (West, Westlaw through 2015 R.S.) (providing that charges for securities fraud must be brought "only before the fifth anniversary of the day on which the offense is committed"); TEX. CODE CRIM. PROC. ANN. art. 12.01(4)(A) (West, Westlaw through 2015 R.S.) (setting out that the statute of limitations for felony theft is "five years from the date of the commission of the offense").

## B.    Securities Fraud

In the fourth issue, Villarreal claims that the five-year statute of limitations barred the State from filing the indictment against him for securities fraud because the date the offense was completed was November 3, 2008, when the parties entered into the Agreement.   First, the State acknowledges, and we agree, that the statute of limitations would have barred an indictment against Villarreal for securities fraud if the State had

---

[8]  State Exhibit 27 is described as one of Eliza Lujan's review reports.

charged Villarreal only with fraud in connection with the "offer to sell" a membership interest in Nafta Holdings. The date the parties signed the Agreement—November 3, 2008—would have been dispositive because it is more than five years prior to the date of the indictment, November 6, 2013. Nonetheless, the State argues that the statute of limitations does not bar the indictment charging Villarreal with securities fraud in connection with the "sale" of a membership interest in Nafta Holdings because the sale was not complete until on or after November 7, 2008, when Garrido deposited his money for the interest in the company. We disagree with this argument.

Article 581-4(E) of the TSA provides that "[t]he term 'sale' means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or other things of value, or any transfer or agreement to transfer, in trust or otherwise. . . ." TEX. REV. CIV. STAT. ANN. art. 581-4(E); *State v. Pub. Util. Comm'n of Tex.*, 344 S.W.3d 349, 359, n.56 (Tex. 2011) ("[T]he Texas definition of 'sale' of a security is broad, including 'every disposition' and 'any transfer or agreement to transfer.'"). Based on the language of article 581-4(E) of the TSA and the terms of the Agreement, we conclude that the sale of the securities in this case occurred when Villarreal and Garrido entered into the Agreement on November 3, 2008. On that date, Villarreal agreed to transfer a security interest in Nafta Holdings to Garrido, and on that date, Garrido committed to purchase the shares and agreed to transfer the money, albeit four days later. Garrido had a contractual obligation to pay on November 3, 2008. The sale was completed under the TSA and by the terms of the Agreement on November 3, 2008.

Because the securities fraud offense was complete on November 3, 2008, the indictment for that offense should have been brought before November 3, 2013, the fifth

22

anniversary of the day on which the offense is committed. *See* TEX. REV. CIV. STAT. ANN. art. 581-29-1. Villarreal was not indicted for this offense until November 6, 2013, more than five years after the completion of the offense. *See Tita*, 267 S.W.3d at 37.

From our de novo review, *see Knot*, 128 S.W.3d at 215, we conclude that the five-year statute of limitations barred the State from filing the indictment against Villarreal for the offense of securities fraud. We sustain Villarreal's fourth issue. Because we have sustained this issue, we need not address issues six, eight, and nine. *See* TEX. R. APP. P. 47.1.

## C. Theft

In his fifth issue, Villarreal claims that the five-year statute of limitations also expired on the theft-by-deception offense. Villarreal contends that the statute of limitations began to run when he exercised control of the property—in this case the money. He argues that this occurred on November 3, 2008, when the investment contract was signed and formed, not when he actually acquired the money. We disagree.

A theft occurs when (1) property is (2) unlawfully appropriated (3) by someone (4) with intent to deprive the owner of that property. TEX. PENAL CODE ANN. § 31.03. A theft is complete when all the elements have occurred. *Barnes v. State*, 824 S.W.2d 560, 562 (Tex. Crim. App. 1991), *overruled on other grounds by Proctor v. State*, 967 S.W.2d 840, 842 (Tex. Crim. App. 1998) (en banc). Villarreal challenges the "unlawfully appropriated" element as the last completed element of the theft offense. And for property other than real property, such as the money in this case, "appropriate" means "to acquire or

23

otherwise exercise control over property." TEX. PENAL CODE ANN. § 31.01(4)(B) (West, Westlaw through 2015 R.S.).

In *Anderson v. State*, the Fourteenth Court of Appeals analyzed the statute of limitations in a case involving aggregate theft. 322 S.W.3d 401, 402 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Anderson, an investment manager, was charged with, among other things, theft based on her handling of investment funds. *Id.* at 405. At trial, Anderson was convicted of theft and misapplication of fiduciary property. *Id.* at 402. On appeal, Anderson argued that the "prosecution for theft was barred by the statute of limitations." *See id.* at 407. The Fourteenth Court held that, because a theft is complete when all the elements have occurred, the statute of limitations began to run when Anderson received the last money from the last investor—i.e., when Anderson unlawfully appropriated the last investor's money. *See id.* at 408. The Fourteenth Court of Appeals did not determine that the statute of limitations began to run when Anderson made subsequent misrepresentations after taking in the money because no additional property was appropriated. *See id.* And, importantly, the court did not determine that the statute of limitations began to run when Anderson entered into the last agreement with the last investor, the signing of which would have occurred before she received any money. *See id.*

The appropriation in this case did not take place until on or after November 7, 2008. Garrido's $1,000,000 investment had been deposited into an account at Wells Fargo by November 7, 2008. Villarreal had access to the Wells Fargo account and transferred most of those funds sometime after November 13, 2008 into an account at First National Bank where he was the sole signatory. *See Bailey v. State*, 885 S.W.2d 193, 199 (Tex.

24

App.—Dallas 1994, pet. ref'd) (holding that "intangible property such as a bank balance can be appropriated by the exercise of control over that property under [penal code] section 31.01"). At this time, Villarreal had acquired or otherwise exercised control over the property. *See* TEX. PENAL CODE ANN. § 31.01(4)(B). Because Villarreal was indicted for theft by deception on November 6, 2013, within five years of either November 7 or November 13, 2008, we conclude that the theft offense is not barred by the statute of limitations. *See* TEX. CODE CRIM. PROC. ANN. art. 12.01(4)(A). We overrule Villarreal's fifth issue.

## V. MATERIAL VARIANCE

By the tenth issue, which we address out of order, Villarreal contends that a material variance exists between the offense alleged in Count II of the indictment, theft of U.S. Currency, and the evidence produced at trial. Villarreal argues that he "found himself in a situation where the charge against him alleged that he appropriated U.S. Currency, but the proof presented at trial was that he appropriated checks." Villarreal argues that he was surprised at trial because he had to defend himself from a charge not specified in the indictment. He asserts that this variance is fatal and, thus, violates his Fifth Amendment right to due process. We are not persuaded by Villarreal's arguments.

Here, the indictment states in relevant part:

> **ALBERTO ALBA VILLARREAL** . . . on or about the **7TH DAY OF NOVEMBER, 2008** . . . did then and there unlawfully appropriate, by acquiring and otherwise exercising control over property, to-it: **U.S. Currency**, of the value of **$200,000 or more**, from **ENRIQUE GARRIDO**, the owner thereof, without the effective consent of the owner, namely, by deception, and with intent to deprive the owner of the property . . . .

25

A variance occurs if there is a discrepancy between the allegation in the indictment and the proof presented at trial. *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001). A variance is material and will require reversal only if it "prejudices the defendant's 'substantial rights,' either by surprising the defendant at trial or by placing him at risk of double jeopardy." *United States v. Baker*, 17 F.3d 94, 98 (5th Cir. 1994). Due process is implicated when the indictment fails to sufficiently inform the defendant of the charge against him in order to allow him to prepare an adequate defense at trial. *Gollihar,* 46 S.W.3d at 248 (citing *U.S. v. Sprick*, 233 F.3d 845, 853 (5th Cir. 2000)).

In this case, the evidence shows that Garrido deposited his checks, in the amount of $1,000,000, into a Nafta Holdings bank account at Wells Fargo Bank. It also shows funds in the amount of $992,648 were transferred from that account into an account at First National Bank, where Villarreal was the only signatory.

First, we cannot conclude that there was a variance because there was no discrepancy between the allegation in the indictment regarding currency and any proof of checks presented at trial. *See Gollihar*, 46 S.W.3d at 246. Villarreal appropriated money or currency. Garrido deposited his $1,000,000 investment into a Wells Fargo account for which Villarreal had access, and sometime after November 13, 2008, Villarreal transferred almost all of Garrido's funds into a First National Bank where he was the sole signatory. In other words, Garrido's checks were merely an instrumentality by which appropriation of the currency was eventually accomplished. *See Jackson v. State*, 646 S.W.2d 225, 226 (Tex. Crim. App. 1983) (en banc); *Kirkpatrick v. State*, 515 S.W.2d 289, 293 (Tex. Crim. App. 1974); *Orr v. State*, 836 S.W.2d 315, 318 (Tex. App.—Austin 1992, no pet.); *see also Denton v. State*, No. 03-96-00006-CR, 1998 WL 476459, at *5

26

(Tex. App.—Austin 1998, pet. ref'd) (op., not designated for publication).  Second, if there was a variance, due process was not implicated; the record does not support a conclusion that the variance prejudiced Villarreal's substantial rights by surprising him at trial so that he could not prepare an adequate defense.  *See Gollihar,* 46 S.W.3d at 248 (citing *Sprick*, 233 F.3d at 853); *see also Baker*, 17 F.3d at 98.  We overrule this tenth issue.

## VI.  SUFFICIENCY OF THE EVIDENCE

By his seventh issue, Villarreal challenges the sufficiency of the evidence to sustain his theft conviction.

## A.  Standard of Review and Applicable Law

In a sufficiency review, this Court examines "all of the evidence in the light most favorable to the verdict and then determine[s] whether a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt."  *Escamilla v. State*, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  This standard requires reviewing courts to resolve any evidentiary inconsistencies in favor of the judgment, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony.  *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West, Westlaw through 2015 R.S.) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony. . . .").  A fact finder may support its verdict with reasonable inferences drawn from the evidence, and it is up to the fact finder to decide which inference is most reasonable.  *Laster v. State*, 275 S.W.3d 512, 523 (Tex. Crim. App. 2009).

27

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *see Malik*, 953 S.W.2d at 240.

## B.     Discussion

### 1.     Theft of U.S. Currency

Villarreal first contends that the State failed to prove theft of U.S. currency. This challenge involves a sufficiency of the evidence claim based upon an alleged variance between the indictment and the proof. *See Fuller v. State*, 73 S.W.3d 250, 253 (Tex. Crim. App. 2002) (en banc); *Gollihar*, 46 S.W.3d at 246–47. But we have already concluded that under *Gollihar*, no variance exists. *See* 46 S.W.3d at 246. We further note that the type of property appropriated is not a substantive element of the theft offense that is required to be included in a hypothetically correct jury charge. *See* TEX. PENAL CODE ANN. § 31.03; *Fuller*, 73 S.W.3d at 254. So any variance between the indictment and the proof at trial was immaterial and does not render the evidence insufficient to support the verdict that Villarreal committed theft of U.S. currency. *See Fuller*, 73 S.W.3d at 254 (citing *Gollihar*, 46 S.W.3d at 254).

### 2.     Appropriation without Effective Consent and Deception

Villarreal also asserts that the evidence is insufficient to establish that he appropriated the U.S. currency without the effective consent of Garrido, the owner, and

28

that he committed theft by deception with the intent to deprive Garrido of his property. We disagree.

As noted above, we review sufficiency complaints under the standard enunciated in *Jackson*. *See* 443 U.S. at 319. The standard of review is meant to give "full play to the [jury's] responsibility fairly" to "draw reasonable inferences from basic facts to ultimate facts." *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003); *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981). This Court considers all the evidence submitted by the prosecution or the defense that sustains the conviction, whether properly or improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993) (en banc); *see Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004). In this review, we are not to re-evaluate the weight and credibility of the evidence, but rather we are to act only to ensure that the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993) (en banc). The standard of review is the same in both direct and circumstantial evidence cases. *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999). And we bear in mind that every fact need not point directly and independently to the accused's guilt. *Vanderbilt v. State*, 629 S.W.2d 709, 716 (Tex. Crim. App. 1981). A conclusion of guilt can rest on the combined and cumulative force of all the incriminating circumstances. *Id.*; *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987) (en banc).

Count II of the indictment charged Villarreal with theft of property by deception. The hypothetically correct jury charge against which this Court measures the sufficiency of the evidence would ask the jury if Villarreal (1) on or about November 7, 2008, (2)

29

unlawfully, (3) appropriated property, (4) with the intent to deprive the owner of the property. *See* TEX. PENAL CODE ANN. § 31.03; *Thomason v. State*, 892 S.W.2d 8, 10 (Tex. Crim. App. 1994) (en banc); *see also Malik*, 953 S.W.2d at 240.

"Appropriate" means to bring about a transfer of title or other non-possessory interest in property or to acquire or otherwise exercise control over property. *See* TEX. PENAL CODE ANN. § 31.01(4). The statute defines three ways in which an appropriation is unlawful, including "without the owner's effective consent." *Id.* §§ 31.01(4), 31.03(b)(1); *Stockman v. State*, 826 S.W.2d 627, 636 (Tex. App.—Dallas 1992, pet. ref'd). The crucial element of theft, then, is the deprivation of property from the rightful owner, without the owner's consent, regardless of whether the defendant at that moment has taken possession of the property. *Stewart v. State*, 44 S.W.3d 582, 589 (Tex. Crim. App. 2001) (en banc); *Martinez v. State*, 198 S.W.3d 36, 44 (Tex. App.—Corpus Christi 2006, no pet.).

Consent is not effective if induced by deception or coercion. TEX. PENAL CODE ANN. § 31.01(3)(A). Penal code section 31.01(1) contains five definitions of "deception." *Id.* § 31.01(1). Deception means, among other things,

> promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

*Id.* § 31.01(1)(E). "Deprive" is assigned three definitions, the most pertinent of which is "to withhold property from the owner permanently." *Id.* § 31.01(2)(C). The intent to deprive is determined from the words and acts of the accused. *Griffin*, 614 S.W.2d at 159; *Roberson v. State*, 821 S.W.2d 446, 448 (Tex. App.—Corpus Christi 1991, pet.

30

ref'd).   A jury may infer intent from any facts which tend to prove its existence, including the method of committing the crime.   *See Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (en banc).

The evidence in this case demonstrates that Villarreal planned to form an insurance company and approached Garrido about investing with him in Nafta Holdings. Villarreal knew that, at that time, Texas law required insurance companies to have $2,000,000 of capital and surplus at a minimum; however, Villarreal represented to Garrido that $4,000,000 was needed.[9]   Villarreal further proposed that Garrido invest $2,000,000 of his own money and that Villarreal would invest the other half needed to meet the $4,000,000 requirement.   Villarreal represented to Garrido that he had sufficient funds to meet his half of the investment, and Villarreal showed Garrido a copy of a Certificate of Deposit in the amount of $2,050,000.   But Villarreal did not disclose that this Certificate of Deposit was already pledged to First National Bank.   Villarreal represented to Garrido that these funds would not be touched—that they would be on "standby"—until the full investment was deposited and the insurance department granted permission to begin selling insurance; however, the evidence shows that after Garrido deposited $1,000,000 into a Nafta Holdings bank account, Villarreal transferred the great majority of those funds into other accounts that were accessible only to him.   Villarreal then expended Garrido's $1,000,000 investment in less than three months.   Garrido testified that he did not consent to Villarreal spending the money in that manner.

---

[9] According to Villarreal's testimony, he wanted to "jump into California which required $5,000,000."

The jury could have reasonably inferred that Villarreal's promises of performance likely affected the judgment of Garrido in deciding to invest in Villarreal's insurance business. *See* TEX. PENAL CODE ANN. § 31.01. On this record, we cannot conclude that a jury would have unfairly or irrationally inferred that Villarreal appropriated the property without Garrido's consent and with the specific intent to deprive Garrido of his money by deception. *See id.*; *Sanders*, 119 S.W.3d at 821; *see also Griffin*, 614 S.W.2d at 159. We must assume that the jury resolved conflicts in testimony, weighed the evidence, and drew reasonable inferences in the manner that supports the verdict. *See Griffin*, 614 S.W.2d at 159. Thus, viewing the evidence in the light most favorable to the verdict and measuring it against the essential elements of theft by deception as defined in a hypothetically correct jury charge, we conclude that a rational jury could have inferred the ultimate facts that Villarreal appropriated the currency, by acquiring or otherwise exercising control over it, with the intent to deprive Garrido of the currency by deception. *See Jackson*, 443 U.S. at 319; *Malik*, 953 S.W.2d at 240; *King v. State*, 174 S.W.3d 796, 811–12 (Tex. App.—Corpus Christi 2005, pet. ref'd) (providing same analysis). Accordingly, we overrule Villarreal's seventh issue.

## VII. PROSECUTORIAL MISCONDUCT

By his twelfth issue, Villarreal brings a prosecutorial misconduct claim. He asserts that the prosecution "represented and gave advice to Garrido regarding his civil suit" against Villarreal. By these alleged actions, Villarreal contends that the prosecution, through Cole, became an interested party by meeting with Garrido without his attorney present and discussing the civil case and "even advis[ing] [Garrido] on the merits of him accepting the settlement in that civil case."

32

We have reviewed the record and have found no support for Villarreal's prosecutorial-misconduct allegations and arguments. And Villarreal cites only to statements made by his trial counsel during his argument in support of Villarreal's motion to disqualify the District Attorney's office. Without more, we have nothing to review. We overrule Villarreal's twelfth issue.

## VIII. CHALLENGES TO TSB PARTICIPATION

By his thirteenth issue, Villarreal argues that the trial court erred when it permitted the TSB "to act as both prosecutors and witnesses in this case." He asserts that this creates a separation-of-powers problem that violates his due process rights.

### A. Participation by Cole

Villarreal first challenges Cole's participation as special prosecutor.[10] He asserts that Cole was biased and had a conflict of interest because of the following:

> Cole worked not for the district attorney's office, but for the Texas Securities Board, which is the same agency who investigated, obtained charges, testified before the grand jury, gave legal advice to the alleged victim, testified at trial and prosecuted the matter despite the fact that this violated separation of powers. Additionally, . . . Cole had established a relationship

---

[10] To the extent the parties address disciplinary rule 3.08, we are guided by the following conclusion reached by the court of criminal appeals in *House v. State*:

> [I]t is unnecessary in cases like this to decide whether the State violated Rule 3.08. This is because if a defendant cannot show actual prejudice from an alleged disciplinary rule violation by the State, then he will not be entitled to relief on appeal. If a defendant can make the necessary showing of actual prejudice, then he will be entitled to relief on appeal. In either situation, it is unnecessary for trial and appellate courts to decide whether the State's conduct violated a disciplinary rule. That is the domain of the State Bar.

947 S.W.2d 251, 253 (Tex. Crim. App. 1997) (en banc); *see* TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West, Westlaw through 2015 R.S.) (TEX. STATE BAR R. art. X, § 9) (providing that, with exceptions that do not apply in this case, "[a] lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client").

with the victim in the case, . . . Garrido, and had been in constant communication with him.

We have already concluded that Cole's participation in this case as a special prosecutor did not violate the separation-of-powers provision of the Texas Constitution because the State maintained control of the prosecution. *See Little-Tex Insulation Co.*, 39 S.W.3d at 600. And we find no support in the record for the allegations that Cole "obtained charges, testified before the grand jury, gave legal advice to [Garrido], . . . [or] . . . had been in constant communication with him."

As to Villarreal's challenge to Cole providing trial testimony, our review of the record reveals that Cole did testify but only at a pre-trial hearing on the State's application to take Garrido's deposition. The State supported its application with Cole's affidavit, and at the hearing, defense counsel cross-examined Cole about statements in her affidavit concerning Garrido's health, his availability to testify at trial, and the need to preserve his testimony.[11] The pre-trial hearing occurred two months before a jury was

_____

[11] In support of its application, the State attached Cole's affidavit, which follows, in relevant part:

Mr. Enrique Garrido Cruz ("Mr. Garrido") is a necessary Witness for the State of Texas in this case. Article 39.025 of the Code of Criminal Procedure provides in subsection (2) (b) that "The court shall order the attorney representing the state to take the deposition of an elderly or disabled person who is the alleged victim of or a witness to an offense not later than the 60th day after the date on which the state files an application to the deposition under Article 39.02." Elderly person is defined by the statute as a person 65 years of age or older. Mr. Garrido is sixty-six (66) years of age, and is the sole victim alleged in the indictment. Mr. Garrido constitutes an "elderly person" as that term is defined in Article 39.025 of the Texas Code of Criminal Procedure.

Furthermore, Article 39.01 of the Texas Code of Criminal Procedure provides that the State may take the deposition of any witness that would be called to testify at trial who by way of age or bodily infirmity cannot attend. Based upon the medical condition of the victim in this case, the State wishes to take his deposition to preserve his testimony in the event he is unable to attend and testify at the trial of this matter.

In June 2014, Mr. Garrido was diagnosed with an enlarged prostate. In July 2014, he underwent surgery to remove some of the tissue from his prostate for testing. Once the test results were received, Mr. Garrido was diagnosed with prostate cancer. Mr.

34

empaneled. And neither the testimony nor the affidavit was admitted before the jury.

Further, the trial court denied the State's application, and Garrido testified at trial. We

cannot conclude that Cole's testimony biased or prejudiced Villarreal so as to violate his

due process rights or created a conflict of interest, as Villarreal now argues.

## B.    Lujan as a Witness for the State

Villarreal also challenges Lujan's participation as a witness for the State. Lujan,

a financial examiner with the TSB, testified, without objection, about her investigation of

the financial records in this case. It is undisputed that Lujan offered no opinions. The

day following her testimony, Villarreal moved to strike Lujan's testimony on the basis that

it was improper for "employees of the same law firm to be witnesses as well as attorneys

in the case." The trial court denied Villarreal's motion, reasoning that this was an

---

Garrido's urologist referred him to an oncologist for further treatment. Mr. Garrido's urologist said he needed time to recover from the first surgery, therefore, he prescribed him some aggressive medications designed to prevent the cancerous cells from spreading further. Mr. Garrido went to several different oncologists and each of them recommended that his entire prostate be removed. On August 26, 2014, Mr. Garrido underwent surgery to remove his prostate. He is under continued medical supervision and has regular medical visits with his doctors in Guadalajara, Mexico to monitor his condition to try to determine the status of his cancer. It is unclear whether the cancer has been completely removed from Mr. Garrido's body. Mr. Garrido has been ordered to be on complete rest and to avoid stressful situations that may affect his recovery. Mr. Garrido is still in intense internal and external pain following the two recent surgeries.

In addition, Mr. Garrido has been diagnosed with Parkinson's disease, which according to the Michael Stern Parkinson's Research Foundation website, is a "progressive, neurodegenerative disease that belongs to the group of conditions called motor system disorder. Parkinson's disease cannot be cured and sufferers get worse over time as the normal bodily functions, including breathing, balance, movement and heart function worsen."

As a result of the medications Mr. Garrido is currently taking, he experiences side effects which at times are debilitating including nausea, anxiety, insomnia and depression. Mr. Garrido is currently spending most of his time in Mexico for medical revisions in Guadalajara and Monterrey.

Mr. Garrido has agreed to appear and give his deposition at a time, date and place agreeable to the State and the defendant pursuant to Article 39.01, et. Seq., of the Texas Code of Criminal Procedure, if so ordered by the Court.

"investigator[-]type situation," that [Lujan] didn't give an opinion" but only testified "as to what facts she discovered and she found in her investigation," and that "if [it] granted the [d]efense request to strike this testimony it would be akin to a prosecutor with the D.A.'s office not being [allowed] to testify."

It is a well-established principle that to preserve an issue for appellate review, a party must make a timely objection at trial. *Becknell v. State*, 720 S.W.2d 526, 532 (Tex. Crim. App. 1981). Timeliness is an important aspect of proper preservation, and objections, including motions to strike, must be made as soon as the ground for it "becomes manifest." *Rhoades v. State*, 934 S.W.2d 113, 127 (Tex. Crim. App. 1996) (en banc); *see Heidelberg v. State*, 36 S.W.3d 668, 672 (Tex. App.—Houston [14 Dist.] 2001, no pet.) (explaining that if it is not possible to object before the evidence is admitted, the objection must be lodged as soon as the objectionable nature of the evidence becomes apparent and, if sustained, a motion to strike the evidence must be urged); *see also* TEX. R. EVID. 103(a)(1) (providing that error in admitting evidence may be preserved by an objection or a motion to strike). If the objection or motion to strike is made any later than this, it does not preserve error. *See Lagrone v. State*, 942 S.W.2d 602, 617–18 (Tex. Crim. App. 1997) (en banc) (concluding objection to questioning untimely when made only four words following testimony and after opposing counsel had passed witness).

Lujan testified without objection. Villarreal moved to strike Lujan's testimony the day after she had been examined, cross-examined, and excused. And we cannot conclude that it was impossible for Villarreal to object during Lujan's testimony because it is clear from the record that the allegedly objectionable nature of the testimony, if any,

36

was apparent at that time. *See Rhoades*, 943 S.W.2d at 127; *Heidelberg*, 36 S.W.3d at 672. Because Villarreal's motion to strike was not made in a timely fashion, his challenge to Lujan's testimony at trial has not been preserved for our review. *See* TEX. R. APP. P. 33.1; *Rhoades*, 934 S.W.2d at 127; *see also Lagrone*, 942 S.W.2d at 617–18.

## C.    Summary

Having concluded that Cole's testimony neither biased or prejudiced Villarreal nor created a conflict of interest, and that Villarreal did not preserve his challenge to Lujan testifying at trial, we overrule this thirteenth issue.

## VIII.    FAILURE TO STRIKE TESTIMONY

By his fourteenth issue, Villarreal contends that the trial court denied him due process, including the right to confront a witness, when it denied his motion to produce Garrido's prior statement. *See* TEX. R. EVID. 615(a). He claims that the trial court should have sanctioned the State by striking Garrido's testimony and granting a mistrial when the State failed to produce Garrido's statement that had been in the State's possession. *See id.* R. 615(e).

It is undisputed that Garrido met with previous district attorneys approximately one year before the case was presented to the grand jury. According to the State, Garrido provided "some sort of video statement," but the statement was lost. The prosecutor affirmatively represented to the trial court that she did not have Garrido's video statement and that she did not know what happened to it.

Pursuant to Texas Rule of Evidence 615, after Garrido testified on direct examination and on Villarreal's motion, the trial court should have ordered the production of any statement in the State's possession that was made by Garrido and related to the

37

subject matter of his testimony and that was not previously produced. *See id.* R. 615(a). Yet by its plain language, rule 615(a) only requires parties to produce witness statements that are in "their possession." *Id.* And it is apparent from our review of the record that the State did not "possess" the statement at the time it was requested. *See id.*; *Jenkins v. State*, 912 S.W.2d 793, 819 (Tex. Crim. App. 1993) (op. on reh'g) (en banc) (holding that rule 615 only requires a prosecutor to produce witness statements that are "in the prosecutor's possession" or in the possession of the "prosecutorial arm of the government"); *Dancer v. State*, 253 S.W.3d 368, 370 (Tex. App.—Fort Worth 2008, pet. ref'd) (per curiam) (mem. op.); *see also Olivas v. State*, No. 08–99–00442–CR, 2000 WL 1867971, at *5 (Tex. App.—El Paso Dec. 21, 2000, no pet.) (op., not designated for publication) (concluding, based on *Jenkins*, that "possession" refers only to statements in the prosecutor's possession). Furthermore, section (e) of the rule requires sanctions only "[i]f the other party elects not to comply with an order to deliver a statement to the moving party." *See* TEX. R. EVID. 615(e). Because the State did not possess Garrido's video statement, the trial court did not order the State to deliver the statement to Villarreal. So the State did not elect not to comply with an order to deliver the statements to Villarreal, and sanctions would not have been proper. *See Marquez v. State*, 757 S.W.2d 101, 103 (Tex. App.—San Antonio 1988, pet. ref'd).

Additionally, the duty to preserve evidence is limited to evidence that possesses an exculpatory value that was apparent before the evidence was destroyed or lost. *See California v. Trombetta*, 467 U.S. 479, 488 (1984). And in order to establish a due process claim, a defendant must make some showing that the lost evidence was favorable and material. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982);

38

*Nastu v. State*, 589 S.W.2d 434, 441 (Tex. Crim. App. 1979). Finally, a criminal defendant must show bad faith on the part of the police (or in this case, the district attorney's office) to establish that failure to preserve potentially useful evidence constitutes a denial of due process. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Penix v. State*, 488 S.W.2d 86, 89 (Tex. Crim. App. 1972).

Villarreal complains about the loss of Garrido's video statement. But there is nothing in the record that establishes that the State was aware the video statement was potentially exculpatory. *See Trombetta*, 467 U.S. at 488. And Villarreal has not shown that the video was in any way favorable and material. *See Valenzuela–Bernal*, 458 U.S. at 873; *Nastu,* 589 S.W.2d at 441. Instead, he appears to be arguing that if Garrido's video statement could be examined and if it was determined that there were inconsistencies between the witness's prior statement and his testimony at trial, his credibility might have been impeached. A showing that the lost evidence might have been favorable is not an affirmative showing that the evidence was favorable and material. *See Valenzuela–Bernal*, 458 U.S. at 873; *Nastu*, 589 S.W.2d at 441. Finally, the record is devoid of any facts showing bad faith on the part of the State. *See id.* Instead, the record shows that the State did not know what happened to the video statement. And a showing of negligence on the part of the police or the government is not equivalent to bad faith. *Saldana v. State*, 783 S.W.2d 22, 23 (Tex. App.—Austin 1990, no pet.) (per curiam); *see United States v. Kennedy*, 714 F.2d 968, 975 (9th Cir. 1983).

39

Based on the above, we conclude that the trial court properly denied Villarreal's motion for production and for sanctions and Villarreal's motion for mistrial. We overrule Villarreal's fourteenth issue.

### IX. COMMENT ON WEIGHT OF THE EVIDENCE

In his fifteenth, sixteenth, seventeenth, and eighteenth issues, Villarreal complains of a comment made by the trial court, which he argues caused egregious harm and violated several of his State and Federal Constitutional rights. Villarreal asserts that the trial court's comment on the weight of the evidence, in effect, instructed a verdict of guilty.

## A. Background

The following exchange occurred during the cross-examination of Martha Davila, a character witness testifying on behalf of Villarreal during the guilt/innocence phase of the trial:

[The State]: Good afternoon. Do you know what the Defendant in this case is charged with?

[Davila]: No, ma'am.

[The State]: And you're not here to tell the jury that you were a signer on any of the bank accounts or that you have any knowledge as to what might have happened to the investor's funds in this case, are you?

[Davila]: No, ma'am.

[The State]: So you have no knowledge to give to the jury as to whether this Defendant may have stolen money from Mr. Garrido, do you?

[Davila]: No, ma'am.

[The State]: Now, you testified that you believe he's an honest and trustworthy person.

[Davila]:        Yes, ma'am.

[The State]:    If you were to learn that the Defendant had used investor funds to be invested into a company for personal expenses, would that change your opinion—

[Defense Counsel]:    Before you answer, Judge, let me— we've heard this before but I think I have a right to pose an objection.    It's not an if-you-were-to-learn question but a have-you-heard as to an actual event that's been proven in order to make that challenge of a character witness.    If you were to learn merely makes an assertion that they have not yet proved and therefore it would be an improper question.

THE COURT:        Sustained.

. . . .

[The State]:    Okay.    So you believe he's an honest, trustworthy person, but if you were to learn, hypothetically, that the Defendant had used investor funds for personal expenses without telling that investor, would that affect your opinion as to his honesty?

[Defense Counsel]: And we'll renew that objection.    The purpose of the have-you-heard is to—if an event have [sic] been   proved and it's been accepted by the Court, then it can come in,   but   if-you-were-to-learn   does   not   meet   that standard[.]

THE COURT:        Sustained.

[The State]:    Have you heard that the Defendant has used investor funds for personal expenses?

[Defense Counsel]: And we'll object to that.    That's not been proved yet.   That's what this whole trial is about.

THE COURT:        *It's what the testimony is so far.*    I'll overrule the objection.

[Defense Counsel]:  Yes, Your Honor.

[The State]:    Have you heard that the Defendant has used investor funds that were supposed to go into a company for his own personal expenses without telling that investor?

[Davila]: No, ma'am.

(Emphasis added.) Villarreal complains of the trial court's comment that is highlighted above.

## B. Applicable Law

> In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible, nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

TEX. CODE CRIM. PROC. ANN. art. 38.05 (West, Westlaw through 2015 R.S.); *see Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003) (holding that a trial judge must refrain from making any remark calculated to convey his opinion of the case because jurors give special and peculiar weight to the language and conduct of the trial judge). "The trial court improperly comments on the weight of the evidence if it makes a statement that implies approval of the State's argument, indicates disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case." *Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

"A witness who testifies to the defendant's good character may be cross-examined to test the witness's awareness of relevant specific instances of conduct." *Wilson v. State*, 71 S.W.3d 346, 350 (Tex. Crim. App. 2002) (internal quotations omitted); *see* TEX. R. EVID. 405(a) ("In all cases where testimony is admitted under this rule, on cross-examination inquiry is allowable into relevant specific instances of conduct."). Generally, "opinion" witnesses are asked "did you know" questions on cross-examination to test the basis for their character assessment. *See Wilson*, 71 S.W.3d at 350 n.4 ("[T]he witness

42

who testifies to the defendant's character on the basis of personal knowledge is most effectively challenged by 'did you know' questions regarding conduct inconsistent with the traits to which he has offered his opinion. . . ."); *Quiroz v. State*, 764 S.W.2d 395, 397–99 (Tex. App.—Fort Worth 1989, pet. ref'd) (holding that "did you know" questions asked of two of defendant's character witnesses at punishment phase regarding defendant's relationship with his daughter and his work were "clearly relevant" to his request for probation when defendant had sworn that he would abide by probation terms, two of which were remaining employed and supporting his dependents). The party cross-examining the character witness may not offer extrinsic evidence to prove that the specific instances actually occurred. *Id.* at 351. The purpose of the inquiry is to test the character witness and the basis of knowledge for her opinion, and the "did you know" question regarding the bad conduct is only probative for this reason. *Id.* (citing FED. R. EVID. 405 cmt.).

## C.    Standard of Review

Being guided by Judge Keasler's concurrence in *Blue v. State* and the First Court of Appeals' reasoning in *Jaenicke v. State*, this Court has previously concluded that a defendant may complain for the first time on appeal, as in this case, about a trial court's lack of impartiality "so long as the trial judge's conduct is so egregious as to deem the judge biased on the matter . . . ." *Hernandez v. State*, 268 S.W.3d 176, 184 (Tex. App.—Corpus Christi 2008, no pet.) (finding that Hernandez could complain for the first time on appeal after determining that the trial judge's conduct—applying "an ill-conceived mathematical formula" and refusing to consider the full range of punishment—was so egregious as to deem it biased on the matter of punishment) (citing *Blue*, 41 S.W.3d 129,

43

129–30 (Tex. Crim. App. 2000) (en banc) (Keasler, J., concurring) (discussing a defendant's right to an impartial judge at the guilt/innocence phase of the trial and reversing a conviction based on comments made by the trial court during voir dire even though Blue failed to object at trial)); *Jaenicke*, 109 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (op. on reh'g) (observing that the right to an impartial judge articulated in Judge Keasler's concurrence should encompass a criminal appellant's complaint that a trial court refused to consider the full range of punishment)).

A trial court's comments do not constitute fundamental error, however, unless they rise to "such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury." *Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001). The *Jasper* Court recognized that several types of comments do not rise to the level of fundamental error, including those the trial court makes to correct counsel's misstatement or misrepresentation of previously admitted testimony, to maintain control and expedite the trial, to clear up a point of confusion, or to reveal irritation at counsel. *Id.*

## D.    Discussion

Villarreal argues that because the proof in support of the theft count was so slight, the trial court's comment was the equivalent of instructing the jury that the State had met its burden of proof of showing that Villarreal had taken investor funds and diverted them to his own personal use; it was calculated to convey to the jury the court's opinion of the case. He contends that because the trial court's comment on the weight of the evidence deprived him of a fair trial by an impartial jury and judge, he was caused egregious harm.

Assuming without deciding that the trial court's statement was an improper comment on the weight of the evidence, *see Simon*, 203 S.W.3d at 590, we would

44

nonetheless conclude that the comment did not constitute fundamental error. *See Jasper*, 61 S.W.3d at 421. In this case, it appears as if the trial court was attempting to clarify that the testimony had been about whether Villarreal used investor funds for personal expenses. *See id.* The trial court commented that there was testimony to that effect. The trial court did not comment that a certain fact had been proven. Moreover, based on our review of the context in which the comment was made, after counsel's previous objections, the trial court could have been attempting to maintain control and expedite the trial, to clear up a point of confusion with counsel's objection, or even to reveal irritation at counsel. *See id.* So even concluding that the trial court improperly commented, the comment was not so egregious as to deem the court biased on the matter. *See id.*; *see also Hernandez*, 268 S.W.3d at 184. We overrule issues fifteen through eighteen.

## X. CONCLUSION

We affirm Villarreal's conviction for theft by deception (Count II). We reverse and render a judgment of acquittal on Villarreal's conviction for securities fraud (Count I).

NELDA V. RODRIGUEZ
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
20th day of October, 2016.

45