

# NUMBER 13-21-00157-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JAMES CRAIG WIEGAND,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                   **Appellee.**

---

### On appeal from the 24th District Court
### of Jackson County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina
Memorandum Opinion by Justice Benavides**

Appellant James Craig Wiegand was convicted by a jury on two counts of aggravated assault with a deadly weapon, second-degree felonies enhanced to first-degree felonies. *See* TEX. PENAL CODE ANN. §§ 12.42(b), 22.02(a)(2). The jury assessed James's punishment at ninety-nine years' imprisonment for each count, with the sentences to run concurrently. *See id.* §§ 12.32, 12.42(b). In a single issue, James

contends the evidence was insufficient to prove that he used or exhibited a deadly weapon during the commission of one of the assaults. We affirm as modified.

## I.  BACKGROUND

On September 7, 2019, James and his wife, Virgie Wiegand, were driving home from a visit with their daughter and grandchildren. Virgie testified that during the car ride, James was "kind of crying" and told her that when they got home, he was "going to get on his four-wheeler, drive out in the back pasture, take his gun[,] and . . . shoot himself." Virgie recounted feeling "shocked" when James said this. She tried driving James to a hospital, but when he noticed Virgie diverted from their ordinary route home, James threatened to "grab that steering wheel . . . [and] flip th[e] car."

According to Virgie, when they got home, James took his four-wheeler for a drive. Virgie called 911 and requested a welfare check. Robbie Sparks, a family friend, testified that James visited his home that evening. He also testified that he called Virgie to inform her of James's whereabouts. Officer Steve Thompson of the Jackson County Sheriff's Office testified that he drove to the Sparks residence to check on James. According to Sparks, although James was initially emotional during his visit, Sparks thought James had "calmed down" by the time Officer Thompson arrived. Officer Thompson testified that he discussed the idea of going to the hospital with James, but James insisted he just wanted "to go home and go to bed." Officer Thompson agreed to drive James back to his home.

Virgie testified that when Officer Thompson brought James home, Officer Thompson told her to "just let him go in there, take a shower, you know. He'll be fine. . . ."

2

Virgie related that James went inside, took a shower, and lay down in bed. Virgie, too, eventually lay down and fell asleep.

According to Virgie, she awoke in the middle of the night to James "yelling at [her] to get up." James began asking her "where's the dog, where's the dog." Virgie told James that she did not know, and James started "yelling what have you done with the dog[,] almost like [she] did something" to the dog.

Virgie testified that she got out of bed and started looking around the house for the dog. When she went to the front door, she saw both James and the dog exit their travel trailer, which was situated outside the house. From this, Virgie surmised the dog had been inside the travel trailer, "[b]ut the dog had been in the house when [they] went to bed." At this point, "with all of this behavior," Virgie thought it might be best for her to leave the house.

She left through the back door as James was entering the home through the front door, but James "caught up with" Virgie before she could reach her car. James "grabbed at" Virgie and "he flung [her] back around and he just jerked [her] back really hard." James "pushed [her] down on the ground and fell over the top of [her.]" He was "laying across" her, and her "leg was hurting really bad." Virgie testified that she "thought he had broke[n] [her] leg at that point."

Virgie stated that she kept asking James to "just let [her] go," but he "said no, you ain[']t going anywhere." James then pulled her "into the house with—with his hands" while Virgie "was on [her] hands and knees . . . trying to get up." When they got inside the house, James told Virgie to "get into the bedroom." She "was walking like on [her] tippy

3

toes limping because it hurt a lot." As she was moving towards the bedroom, she saw that there was "a long brown gun" on the couch that she did not "remember being there before." Virgie testified that she "had been sitting in that spot" earlier, and she "didn't know how it showed up or why it was there." Virgie stated that she reached for the brown gun, but James pushed her and grabbed it before she could. Virgie explained that this sequence of events "seemed to happen all at one time."

According to Virgie, when the two got back into the bedroom, James said, "I guess this one is jammed," referring to the gun he was wielding. He then tossed the brown gun, picked up "a black gun," and said, "oh well. . . . this will take more bullets[,] but it will get the job done." Virgie testified that James then told her he was going to kill her while pointing the black gun at her. He then fired the gun "at least seven times," missing Virgie each time.

Virgie testified that James then took her into the living room and told her to write a letter to her children. Virgie also recounted that James "did at all times have the gun as he had kept it with him." The letter Virgie wrote was admitted into evidence at trial and reads, "I'm sorry for what ever [sic] I may have done to bring this on our family[.]" Virgie testified that James wrote his own note, which was also admitted into evidence at trial, and reads:

> I asked her & asked her[.] I even told her what was going to happen tonight. But as usuall [sic] no belivefs [sic]. But as you can see some should have listened[.] Especially Virgie. I[']m going to . . . ask forgiveness before the sin. Lord I am very sick but can[']t get anyone to listen[.] Well now I don[']t have to hear the voices anymore.

After writing the letter, Virgie told her husband that she needed to use the restroom.

4

James "grab[bed] [her] arm" and took her to the bathroom but told her not to shut the door. Virgie flushed the toilet to cover the sound of her opening the glass window in the bathroom. She "went through and out the window and fell on the ground." Virgie headed towards her neighbors' residence but had to go through a barbed wire fence to get to their house. The neighboring couple eventually helped her inside, called the police, and waited with her for their arrival. Officer Thompson responded to this call, as well.

James was arrested on September 8, 2019. The jury convicted James of two counts of aggravated assault with a deadly weapon. *See id.* § 22.02(a)(2). This appeal followed. *See* TEX. CODE CRIM. PROC. ANN. art. 44.02.

## II.    SUFFICIENCY OF THE EVIDENCE

James argues that the evidence is insufficient to show that the assault and the use or exhibition of a deadly weapon occurred simultaneously, because "any acts that could cause a 'bodily injury,' for the purposes of Count 1 as plead[ed] in the indictment, did not occur when a firearm was present, used[,] or exhibited."

## A.    Standard of Review & Applicable Law

"The sufficiency of the evidence is measured by comparing the evidence produced at trial to 'the essential elements of the offense as defined by the hypothetically correct jury charge.'" *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "A hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the

5

defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

In reviewing evidence for sufficiency, we consider all the evidence presented in the light most favorable to the verdict to determine whether the trial court was justified in finding guilt beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This generally means that we resolve "any ambiguities in the evidence in the prosecution's favor." *Brooks v. State*, 634 S.W.3d 745, 748 (Tex. Crim. App. 2021).

"The testimony of a single eyewitness can be sufficient to support a conviction." *Arrellano v. State*, 555 S.W.3d 647, 651 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). And a jury may believe only certain portions of a witness's testimony. *Id.* We defer to the jury's credibility and weight determinations because they are the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Id.*

Here, to prove that James committed aggravated assault with a deadly weapon as alleged in Count 1, the hypothetically correct jury charge required a showing that he: (1) intentionally, knowingly, or recklessly, (2) caused bodily injury to Virgie,[1] and (3) exhibited or used a deadly weapon during the assault, to wit, a firearm.[2] *See* TEX. PENAL CODE ANN.

---

[1] Although the indictment specifically alleged that James caused the injury to Virgie by making contact with her with his hand, the hypothetically correct jury charge need not include the manner and means by which the injury was caused. *See Hernandez v. State*, 556 S.W.3d 308, 316 (Tex. Crim. App. 2017) (holding that a variance concerning "the manner and means by which the bodily injury was caused" is not material unless "it converts the offense proven at trial into a different offense than what was pled in the charging instrument"); *Johnson v. State*, 364 S.W.3d 292, 298 (Tex. Crim. App. 2012) (nothing that aggravated assault is a "result-of-conduct crime with the focus or gravamen being the victim and the bodily injury that was inflicted" and "[t]he precise act or nature of conduct in this result-oriented offense is inconsequential").

[2] The indictment and jury charge also alleged that James committed this act against someone with whom he shared a dating or family relationship as defined by the Texas Family Code. *See* TEX. FAM. CODE ANN. §§ 71.0021(b), 71.003. However, the indictment and jury charge did not also allege or require a finding that James caused *serious* bodily injury to Virgie, as would be required to transform an aggravated assault with a deadly weapon charge into an aggravated assault on a family member charge. *See* TEX. PENAL CODE

§§ 22.01(a)(1), 22.02(a)(2).

An aggravated assault occurs when a person commits a simple assault and uses a deadly weapon during the commission of the assault. *See id.* §§ 22.01(a), 22.02(a)(2); *Wade*, 951 S.W.2d at 889. "[T]he offense is result oriented and . . . the gravamina of the offense are the victim and the bodily injury that was inflicted." *Hernandez v. State*, 556 S.W.3d 308, 325 (Tex. Crim. App. 2017). "Bodily injury" means "physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8). "Any physical pain, however minor, will suffice to establish bodily injury." *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012). "[A] factfinder may infer that a victim actually suffered physical pain, and no witness—including the victim—need testify that the victim felt pain." *Coleman v. State*, 631 S.W.3d 744, 751 (Tex. App.—Houston 2021, pet. ref'd). "The existence of a cut, bruise, or scrape on the body is sufficient evidence of physical pain necessary to establish 'bodily injury' within the meaning of the statute." *Arzaga v. State*, 86 S.W.3d 767, 778 (Tex. App.—El Paso 2002, no pet.).

One "uses" a deadly weapon during the commission of an assault if the deadly weapon was "utilized, employed, or applied in order to achieve its intended result: 'the commission of a felony offense.'" *Safian v. State*, 543 S.W.3d 216, 223 (Tex. Crim. App.

---

ANN. §§ 22.02(a)(2), (b)(1).

Although the caption of the indictment charges James with violating Texas Penal Code § 22.02(b)(1), the body of the indictment only meets the required elements for a violation of Texas Penal Code § 22.02(a)(2). *See id.* §§ 22.02(a)(2), (b)(1). "[W]hen the caption [of an indictment] lists a different offense from the one alleged in the body of the indictment, . . . the body of the indictment controls." *Villarreal v. State*, 504 S.W.3d 494, 507 n. 6 (Tex. App.—Corpus Christi–Edinburg 2016, pet. ref'd). We assume without deciding that the State was also required to prove beyond a reasonable doubt that James had a dating and/or familial relationship with Virgie to prove that James committed aggravated assault with a deadly weapon. However, James does not complain on appeal about the inclusion of this superfluous element, nor does he challenge the sufficiency of the evidence regarding it. Therefore, we do not discuss it further. *See* TEX. R. APP. P. 47.1.

2018) (quoting *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989)). Exhibiting a deadly weapon "only requires that a deadly weapon be consciously shown, displayed, or presented to be viewed during 'the commission of a felony offense.'" *Id.* (quoting *Patterson*, 769 S.W.2d at 941). Using a deadly weapon extends to "*any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony." *Id.* at 223–24 (quoting *Patterson*, 769 S.W.2d at 941). The court of criminal appeals has noted that "one can 'use' a deadly weapon without exhibiting it, but it is doubtful that one can exhibit a deadly weapon during the commission of a felony without using it.'" *Id.* at 224 (quoting *Patterson*, 769 S.W.2d at 941).

**B.    Analysis**

James does not challenge the conviction on Count 2, which stems from James repeatedly firing the gun in Virgie's direction. *See* Tex. Penal Code Ann. §§ 22.01(a)(2) (defining simple assault to include "intentionally or knowingly threaten[ing] another with imminent bodily injury"), 22.02(a) (including § 22.01 in the definition of aggravated assault). Rather, James argues that any assault that resulted in bodily injury, as alleged in Count 1, was too far removed from his wielding of a gun to sufficiently show he committed a second aggravated assault with a deadly weapon.

Officer Thompson testified that when he arrived on the scene after Virgie's neighbors called the police, Virgie "told [him] that James had assaulted her and threatened to kill her with a rifle." Virgie testified that after she wrote her letter, James "grab[bed] her arm" and took her to the bathroom. She stated that James "did at all times have the gun as he had kept it with him." Photos of Virgie were taken that same evening

8

and show what appears to be bruising on her arm. Officer Thompson testified that when he spoke to Virgie, she described "her knee pain and her arms being bruised up." The jury could have concluded that the gun was used in facilitating the assault because "its presence was used by appellant to instill in the complainant apprehension, reducing the likelihood of resistance during the encounter." *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000).

James attributes Virgie's injuries mainly to "the fences and other obstacles [she] encountered" when escaping to her neighbors' residence. Although Virgie stated that she "cut [her] leg up pretty good" when she went through the barbed wire fence, she did not testify that her arms were injured during her escape. Bearing in mind the evidence presented at trial and the reasonable inferences the jury could have drawn from it, we conclude that the evidence is sufficient to support James's conviction on Count 1. *See Coleman*, 631 S.W.3d at 751; *Arzaga*, 86 S.W.3d at 778.

We therefore overrule James's sole issue on appeal.

### III.    MODIFICATION OF JUDGMENT

Lastly, in his brief, James notes that the judgment for Count 1 lists the "Statute for Offense" as "Sec. 22.02(b)(1)–Penal Code," but the record reflects he was convicted of violating Texas Penal Code § 22.02(a)(2). *See* TEX. PENAL CODE ANN. § 22.02(a)(2), (b)(1). James asks this Court to modify the judgment to correct this discrepancy. We grant this request and modify the "Statute for Offense" section on the judgment for Count 1 to list the statute James violated as "Sec. 22.02(a)(2)–Penal Code" instead. *See Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) (discussing the

authority of an appellate court to reform incorrect judgments).

Additionally, both judgments incorrectly list James's sentence as "NINETY (99) YEARS IN TDCJ." We modify this portion of each judgment to read "NINETY-NINE (99) YEARS IN TDCJ." *See id.*

## IV.    CONCLUSION

We affirm the trial court's judgment as modified.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
11th day of August, 2022.

10