

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| KEITH WHITE, | § | No. 08-24-00071-CR |
| Appellant, | § | Appeal from the |
| v. | § | 278th District Court |
| THE STATE OF TEXAS, | § | of Madison County, Texas |
| Appellee. | § | (TC# 21-13609) |

## <u>MEMORANDUM OPINION</u>

A jury found Appellant, Keith White, guilty of assaulting a government contractor while Appellant was an inmate at the Ferguson Unit of the Texas Department of Criminal Justice (TDCJ) in Madison County. The jury assessed punishment at 80 years' confinement. In two issues on appeal, Appellant asserts (1) the evidence is insufficient to support his conviction, and (2) the trial court erred by denying his motion for new trial because the prosecutor who tried his case did not act under the direction of the elected district attorney. We affirm.[1]

---

[1] The appeal was transferred to this Court from the Tenth Court of Appeals pursuant to a Texas Supreme Court docket equalization order. Accordingly, we apply the Tenth Court of Appeals' precedent to the extent it conflicts with our own. *See* Tex. R. App. P. 41.3.

# I. BACKGROUND

Appellant was indicted on the charge of assaulting a government contractor, Lauryn Humbert, by throwing hot liquid on her and causing bodily injury while he was an inmate at the Ferguson Unit on August 8, 2020. Although Appellant had been appointed trial counsel, by the time of trial, he represented himself pro se, with Christopher Moutray acting as stand-by counsel. The State was represented by Rachel Jordan, an attorney from the Special Prosecution Unit (SPU). During the guilt-innocence phase of trial, six witnesses testified for the State and two witness (one of whom was Appellant) testified on Appellant's behalf.

Humbert testified she was a registered nurse who worked for University of Texas Medical Branch, which contracted to provide medical care to individuals incarcerated at the TDCJ. Before becoming a registered nurse, she was a licensed vocational nurse, at which time she worked at the Ferguson Unit as a contractor. Her duties included evaluating inmates to determine if they needed to see a provider, dispensing medication, and performing "cellside analysis" in the cell block. She also worked in the medical clinic.

Humbert stated she worked at the Ferguson Unit on August 8, 2020, dispensing medication with a correctional officer escort—Khaleel Magee. Humbert said she handed out medication to "eight cell" and was walking to "ten cell" to deliver medication when "the offender in nine cell said my name or something to get my attention, and I turned to acknowledge[.]" When she turned to acknowledge the inmate—Appellant—she "was splashed with boiling water, burning hot scalding liquid on [her] face and neck and arms[.]" Humbert said it hurt, and she was "terrified." Humbert believed she needed to "leave the dangerous situation that [she] was in, and just get out and get the hot liquid off of" her. She did not know what the liquid was, but it felt "oily and just wet." Humbert was escorted to the medical clinic where she was treated for her burns. Over

2

Appellant's objection, the trial court admitted three photographs showing redness to Humbert's arm and chest. She said the first- and second-degree burns remained for four or five days.

Humbert did not know whether Appellant was upset with her when he threw the water, although she later testified Appellant was upset with her because he believed he did not receive the care he should have gotten when he saw her following a "use of force" event in July 2020. Humbert stated that she medically cleared Appellant following the July event after addressing and noting his injuries[2] and determining he had no "adverse effects," i.e., life-threatening injuries. She did not recall Appellant telling her he had a concussion and was bleeding internally and externally when she saw him at that time.

Magee testified he was a correctional officer at the Ferguson Unit in August 2020, and he escorted Humbert as she performed her medical duties. He said Humbert was stopped while she performed her duties, and there was a brief exchange of words between her and Appellant. "[T]hen there was water thrown through the cell, and after that happened, I immediately, I looked at [Humbert] and attempted to get her away to safety[.]" Magee stated her skin was "red, irritated" and "[s]omething hot" had been thrown at her. When asked what indicated the liquid was hot, Magee replied, "she was fanning herself," she "was yelling, exclaiming that her skin was burning." He could see that her skin was red.

James Blake testified he was the Assistant Warden at the Ferguson Unit in August 2020. He explained that a "use of force" was any physical contact between staff and inmates that constituted "some kind of a conflict." He saw Humbert after the incident and remembered her skin appearing much redder than it did in the photographs. Blake testified that inmates are allowed to

---

[2] Humbert explained that Appellant complained about his knees and swollen eyes. She noted abrasions on his back, a scratch on his left knee, and swelling to his right eye. She cleaned a scrape on his head.

3

purchase "hot pots" to heat up their water. He said inmates without a hot pot are "crafty" and can figure out other ways to heat water.[3] Blake testified that if an inmate intended to throw hot water at someone, they might add oil to the water because

> the oil really makes it stick to the body. It's more of a–it's a lot more aggressive attack when they add oil to the water. You can't get it off. It's oily. It's what you can imagine. It's not like water, where you can maybe pull your clothes off. That oil is going to stick to you.

He did not recall whether Appellant had a hot pot in his cell.

Virginia Lovell testified she was the nurse manager in the Ferguson Unit medical clinic in August 2020. Lowell treated Humbert after the incident and said Humbert had "some redness and . . . what appeared to be burns to her chest and her arm." She also said the burns were redder than they appeared in the photographs, and the photographs did not show the blistering on some of the edges by the time she arrived at the clinic to treat Humbert.

James Thrailkill testified he was an investigator employed by the Office of the Inspector General and, in August 2020, he was assigned to the Ferguson Unit. After the incident, he took witness statements, although Appellant declined to give a statement. Appellant later sent Thrailkill an I-60, which is a note from an inmate to a department about any issue or request. In Appellant's I-60, Thrailkill said, Appellant admitted he assaulted Humbert and claimed he did not receive medical care following the July event. Thrailkill said he did not know if Appellant had any device to heat water, and he could not prove Appellant heated any water.

---

[3] For example, he said inmates take a roll of toilet paper, put it underneath something, and "there's a fancy way that they can light it on the inside, and it looks–the way it burns, it looks like a sternum that you would buy from Wal-Mart." They also fashion "electrical things from the outlet to a container of water to heat it up." A later witness testified that inmates can heat water using a stinger, which is "made from any number of things, old razor blades, pieces of wire, where they hook them together and they're able to plug it into an outlet, where it sits down in the water and the current from the outlet heats up the water."

Appellant testified about the injuries he said he suffered from the July use of force as follows:

> Well this incident happened because I was brutally beaten, and they covered up the whole crime scene and left me in the cell, and I had a concussion, I was bleeding from internal and external bleeding, and I couldn't go to sleep because if I went to sleep I would have died. The commode was full of blood, and I tried to get a officer to help me out, and nobody would help me out. The inmates tried to get me out of the cell as well. They was completely covering it up. So I was bleeding–like I said, there was blood in the commode, and I couldn't sleep because I would have died in my sleep. My face was swollen, cracked, my bones cracked in my face, and the bone leading to my nose, and the internal bleeding. I was bleeding from my nose and coughing up blood.

Appellant claimed he tried to get medical assistance by throwing water on another individual, but that person did not report the incident. He said his plan

> was if he [the other individual] would do his job and get the ranger down with the camera, then I can get on camera and say my life is in danger. I'm bleeding and so on. When he did not do that, they was still trying to cover it up.

Appellant admitted he "intentionally threw water out of his cell" at Humbert because his life was in danger and he was bleeding to death. Appellant also admitted he knew Humbert was dispensing medicine at the time and he knew she was one of the nurses on the Ferguson Unit. Appellant said that when he threw what he insisted was cold water on her, he was eventually taken to a hospital where he was diagnosed with a concussion and head trauma. Appellant maintained that no hot pot or stinger was found in his cell.

The final witness to testify was Jory Hawkins, who worked at the Ferguson Unit and conducted the search of Appellant's cell after the incident involving Humbert. Hawkins said a stinger was found inside Appellant's cell, but it was not preserved as evidence.[4] He also did not take any photographs of the cell.

---

[4] Hawkins explained that they find stingers "all day every day" and consider them "trash." He said "[i]t was common practice, which is probably why we dispose of them."

The jury found Appellant guilty of assaulting a government contractor and assessed punishment at 80 years' confinement. Appellant's sentence was to run consecutively with a 2012 conviction out of Wichita County.[5]

Appellant filed a motion for new trial challenging Jordan's authority to try his case in the absence of supervision by the district attorney.[6] The court denied his motion, and this appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Appellant contends the evidence is insufficient to overcome the defense of necessity. According to Appellant, the assault was necessary because it was the only way he could get medical attention. Appellant did not request a jury instruction on the defense of necessity and, on appeal, he does not complain about the trial court not including such an instruction sue sponte. Instead, he contends the sufficiency of the evidence should be measured against a hypothetically correct jury charge that included a necessity instruction.[7]

### A. Applicable law and standard of review

A hypothetically correct jury charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately

---

[5] This conviction arose from Appellant's assault on a corrections officer during his incarceration in Wichita County. *See White v. State*, No. 02-12-00087-CR, 2013 WL 4210827, at *1 (Tex. App.—Fort Worth Aug. 15, 2013, no pet.) (per curiam) (mem. op., not designated for publication).

[6] After trial, the trial court appointed an attorney to represent Appellant on appeal. This attorney filed the motion for new trial on Appellant's behalf and represented him at the hearing on the motion.

[7] Necessity is a defense to prosecution. *Aldava v. State*, No. 08-22-00118-CR, 2023 WL 3910265, at *2 (Tex. App.—El Paso June 8, 2023, pet. ref'd) (mem. op., not designated for publication). The defense of necessity consists of three elements: (1) the defendant reasonably believed the conduct was immediately necessary to avoid imminent harm; (2) the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear. Tex. Penal Code Ann. § 9.22.

describes the offense for which the defendant was tried. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc). "As to defenses, a hypothetically correct jury charge does not include any and all potential defensive issues but only those applicable to the case." *Osborne v. State*, No. 07-13-00156-CR, 2015 WL 3463047, at *3 (Tex. App.—Amarillo May 29, 2015, pet. ref'd) (mem. op., not designated for publication). A defensive issue is not applicable to the case unless the defendant timely requests the issue or objects to the omission of the issue in the jury charge. *Tolbert v. State*, 306 S.W.3d 776, 780 (Tex. Crim. App. 2010); *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998) (en banc); *Osborne*, 2015 WL 3463047, at *3. If a particular defense is not requested, it is not considered in the hypothetically-correct-jury-charge sufficiency review. *See Wagner v. State*, No. 10-15-00397-CR, 2016 WL 3977456, at *1 (Tex. App.—Waco July 20, 2016, no pet.) (mem. op., not designated for publication); *Osborne*, 2015 WL 3463047, at *3; *Villa v. State*, 370 S.W.3d 787, 791 (Tex. App.—Eastland 2012), *aff'd*, 417 S.W.3d 455 (Tex. Crim. App. 2013).

Here, Appellant did not request an instruction on the defense of necessity. Therefore, this defense is not applicable to the case and our review will not consider whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found against Appellant on the necessity defense beyond a reasonable doubt. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (en banc). Instead, we apply the well-settled standard for review of the legal sufficiency of the evidence in support of the jury's verdict.

"In assessing the legal sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13

7

(Tex. Crim. App. 2007); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (holding *Jackson* legal-sufficiency standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt").

We defer to trier of fact to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. "In reviewing the sufficiency of the evidence, we should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.* "On appeal, the same standard of review is used for both circumstantial and direct evidence cases." *Id.*

### B. Analysis

A person commits the offense of assault if the person "intentionally, knowingly, or recklessly causes bodily injury to another[.]" Tex. Penal Code Ann. § 22.01(a)(1). Assault is a third degree felony if the offense is committed against "a person who contracts with government to perform a service in a facility described by [Penal Code] § 1.07(a)(14)"[8] "while the person or

---

[8] Defining "correctional facility" as "a place designated by law for the confinement of a person arrested for, charged with, or convicted of a criminal offense." Tex. Penal Code Ann. § 1.07(14).

employee is engaged in performing a service within the scope of the contract, if the actor knows the person or employee is authorized by government to provide the service[.]" *Id.* § 22.01(b)(3)(A).

The jury was instructed that it must decide whether the State proved, beyond a reasonable doubt, that Appellant "intentionally, knowingly, or recklessly cause[d] bodily injury to Lauryn Humbert by throwing hot liquid on her chest"; that Appellant knew Humbert was "a person who had contracted with government to perform a service in the" Ferguson Unit and that she was "performing the service"; and that Appellant knew Humbert "was authorized by government to provide the service." On appeal, Appellant does not challenge the sufficiency of the evidence in support of the jury's implied findings. Nevertheless, our review of the record reveals the evidence was legally sufficient.

At trial, Appellant did not dispute Humbert's status as a government contractor. He admitted he knew that Humbert was dispensing medicine at the time and that she was one of the nurses on the Ferguson Unit. He admitted he intentionally threw water at her. The only factual dispute was whether the water was cold or hot and whether Appellant had a heating device in his cell. Appellant contended the water was cold, but Humbert testified the water was hot. Appellant contended no hot pot or stringer was found in his cell. But the jury also heard evidence that Humbert suffered burns from the water, inmates could heat water in their cells, and a device to heat water (a stinger) was later found in Appellant's cell. Although there was conflicting evidence, we defer to the jury to resolve conflicts in testimony, assess credibility, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. After considering all the evidence in the light most favorable to the verdict, as we must, we conclude that, based on the evidence and reasonable inferences therefrom, a rational juror could have found

9

the essential elements of the offense beyond a reasonable doubt. *See id.* Therefore, we overrule Appellant's second issue.

## III. SPU PROSECUTOR

On appeal, Appellant does not challenge Jordan's authority to prosecute his case. Instead, in his first issue, he contends the trial court erred by denying his motion for new trial because she, as a "special prosecutor," was required to, but did not, act under the supervision of the elected district attorney. He asks this Court to reverse the trial court's judgment and remand for a new trial on this basis.

### A. Hearing on motion for new trial

Courtney Cain testified she was formerly a prosecutor in Grimes County, Texas, and was later elected Criminal District Attorney for Madison County. Cain was not the Madison County District Attorney when Appellant was indicted in 2021. When Cain was elected District Attorney, but before she took office on January 1, 2023, she met with Jordan "in regard to moving forward on [Jordan's cases], and that [Jordan] would just notify [her] if there is a big case, like a murder, on the unit." Cain said that since taking office, she is usually present when SPU prosecutors present their cases to a grand jury. However, when Cain took office, she did not meet with any of the prosecutors from the SPU about their cases. The SPU retained authority, prosecutorial discretion, and control over cases that came out of the Ferguson Unit.

Regarding Appellant's case, Cain testified she was not familiar with his case, none of the filed pleadings went through her office, and SPU prosecution files were not kept in her office. Cain testified that her intent, once she took office, was for the SPU to proceed as it did in all the other 14 jurisdictions, "specifically like [her] experience with Grimes County, where [the SPU] handled all the SPU cases in Grimes County." Cain said she was aware of the trial that proceeded against

Appellant with the SPU and was "okay with that." She understood the SPU prosecutors were "special prosecutors under [her] authority" and they were not attorneys pro tem. She knew the Ferguson Unit was in Madison County, but she did not know whether that made her a member of the SPU board of directors.

Christopher Moutray, Appellant's trial stand-by counsel, testified all his communications were with Jordan, and he did not communicate with the District Attorney's Office. He also said that no one from the District Attorney's Office participated in Appellant's trial.

Jordan testified she handled Appellant's case from its beginning, including presenting the case to the grand jury. She does not review a case from the Ferguson Unit with the District Attorney before presenting it to a grand jury, nor does she obtain the District Attorney's approval to present the case. She agreed that all files for cases her office worked on were kept at her office and not the District Attorney's office.

After the three witnesses testified, the trial court heard arguments and then ruled from the bench as follows:

> All right, the Court's going to find and hold there's no question the Special Prison Prosecution Unit has the authority. To the extent of supervision, it seems like it would be somewhat of an absurd result if I were to hold and find that the local District Attorney, or one of their representatives, had to sit in on SPU cases. That kind of defeats the purpose, in my opinion, of what the SPU is. They are there to relieve a burden from the local counties where units are located, off of the local District Attorney, to, you know, to prosecute those cases. Again, with regard to the level of supervision, that just seems to be some kind of subjective standard–I mean, nobody's saying to Ms. Cain, if she wanted to come in here and look over these people's shoulder, she has the authority to do that. Well–but I don't think she's required to get up there and whisper in their ear about evidentiary matters, whose witnesses they are calling, but if there's a case that has held some interest to the local District Attorney in the county where the case is being prosecuted, they have every right to be involved in that.
>
> I don't think it's a check list deal. I think it's very–it's kind of an esoteric concept, but I can't say that because of the way the system is set up that the local District

Attorney has supervisory authority. Now whether she chooses to exercise that, I don't think there's any requirement that I would require them to start sending a letter saying you have the authority to try this case. Quite frankly, in my court, whether it's Walker County, Madison County–I don't think I've got anything in Leon County, but we don't set the dockets. They set their own dockets, and they send them to us, and then we make sure that the bench warrants and everything are taken care of, to make sure that the client is present at the time designated by the Court for whatever hearing he's going to have. . . .

The court later signed an order denying Appellant's motion for new trial.

### B. Standard of review

We review a trial court's denial of a motion for new trial for an abuse of discretion, "reversing only if no reasonable view of the record could support the trial court's ruling." *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). We do not substitute our own judgment for that of the trial court; we must uphold the trial court's ruling "if it is within the zone of reasonable disagreement." *Id.*; *see also Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006) (recognizing that an appellate court's role is to "decide whether the trial court's decision was arbitrary or unreasonable").

### C. Applicable law

Appellant characterizes Jordan as a special prosecutor and contends the trial court erred by denying his motion for new trial because, as a special prosecutor, she was required to, but did not, act under the supervision of the Madison County District Attorney.

The State, on the other hand, distinguishes between a special prosecutor and an SPU prosecutor. According to the State, a special prosecutor is locally assigned to a case, but SPU prosecutors are legislatively created and designed to cooperate with and support state prosecuting attorneys in prosecuting cases emanating from the TDCJ. Therefore, the State concludes, the Texas Legislature never intended "SPU attorneys to be customary special prosecutors that have to be supervised in each case by the local state prosecuting attorney." We agree with the State and begin

12

our analysis with the distinctions between "district attorneys," SPU prosecutors, and "special prosecutors."

### (1) District attorneys

The Texas Constitution gives the authority to prosecute criminal cases to the county attorneys, criminal district attorneys, and district attorneys, under the regulation of the legislature. *Saldano v. State*, 70 S.W.3d 873, 876 (Tex. Crim. App. 2002) (en banc); Tex. Const. art. V, § 21. The Texas Code of Criminal Procedure discusses the duties of district attorneys:

> Each district attorney shall represent the State in all criminal cases in the district courts of his district . . . except in cases where he has been, before his election, employed adversely. . . . It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done.

Tex. Code Crim. Proc. Ann. art. 2.01. "The office of district attorney has always been in the judicial department of government." *Saldano*, 70 S.W.3d at 876. Texas Government Code § 41.301 defines a "prosecuting attorney" as "a district attorney, a criminal district attorney, or a county attorney representing the state in criminal matters before the district or inferior courts of the county." Tex. Gov't Code Ann. § 41.301(5).[9]

### (2) Prosecutors for the SPU

Although district attorneys have constitutional and statutory authority to prosecute criminal cases for the State,[10] the Texas Legislature has created a statutory scheme that authorizes attorneys with the SPU to prosecute certain criminal offenses. This statutory scheme is found in Texas Government Code Chapter 41, Subchapter E. *See* Tex. Gov't Code Ann §§ 41.301–41.310. The

---

[9] Although the Texas Constitution and several statutes cited in this opinion use the phrase "prosecuting attorney" to refer to county attorneys, criminal district attorneys, and district attorneys collectively, because Cain is the Madison County Criminal District Attorney, we shall use the phrase "district attorney" in place of the collective phrase and in place of the phrase "prosecuting attorney."

[10] *See* Tex. Const. art. V, § 21; Tex. Code Crim. Proc. Ann. art. 2.01.

SPU "is an independent unit that cooperates with and supports prosecuting attorneys in prosecuting offenses and delinquent conduct described by Article 104.003(a), Code of Criminal Procedure." *Id.* § 41.302; *see also id.* § 41.301(6) ("'Unit' means the special prosecution unit."). Thus, the SPU is the "entity responsible for prosecuting crimes committed within the prison system[.]" *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004) (en banc); *see also Ex parte Jones*, 97 S.W.3d 586, 589 (Tex. Crim. App. 2003) (the SPU "has authority to prosecute inmate offenses in an appropriate venue"). The Texas Legislature has codified the payment of prosecutors for the SPU to prosecute crimes on property owned by the TDCJ. *See* Tex. Code Crim. Proc. Ann. art. 104.003.[11]

Although the SPU "cooperates with and supports [district attorneys]," the SPU "is governed by a board of directors composed of each [district attorney] who:"

(1) represents the state in criminal matters before a court in a county in which one or more facilities owned or operated by or under contract with the department or the Texas Juvenile Justice Department are located; and

(2) has entered into a memorandum of understanding with the unit for the prosecution of offenses and delinquent conduct described by Article 104.003(a), Code of Criminal Procedure.

Tex. Gov't Code Ann § 41.303(a). "A [district] attorney described by Subsection (a) shall serve on the board of directors in addition to the other duties of the [district] attorney assigned by law." *Id.* § 41.303(b).We interpret subsection (2) as the method by which a district attorney in a county

---

[11] Tex. Code Crim. Proc. Ann. art. 104.003(a) governs payment of certain prosecution costs in "a prosecution of a criminal offense or delinquent conduct committed on property owned or operated by or under contract with the Texas Department of Criminal Justice or the Texas Juvenile Justice Department, or committed by or against a person in the custody of the Texas Department of Criminal Justice or the Texas Juvenile Justice Department."

described in subsection (1) delegates to the SPU the prosecution of offenses and delinquent conduct described by Article 104.003(a).[12]

The board of directors of the SPU is governed by an executive board composed of 11 members elected by the membership of the board of directors. *Id.* § 41.304(a). "The executive board shall conduct the business of the unit." *Id.* § 41.304(c). The executive board "shall employ a person to serve as chief of the unit and additional persons to accomplish the unit's purposes." *Id.* § 41.308. Thus, although district attorneys are constitutionally vested with the authority to prosecute crime under Tex. Const. art. V, § 21, pursuant to Chapter 41, Subchapter E of the Government Code, the SPU board of directors—comprised of district attorneys who have signed a memorandum of understanding—and more directly a "chief of the unit" all provide oversight of the functions of SPU attorneys.

### (3) Special prosecutors[13]

A "special prosecutor" "is *permitted* by the elected district attorney to participate in a particular case to the extent allowed by the [district] attorney, without being required to take the constitutional oath of office." *Rosenbaum*, 852 S.W.2d at 529 (emphasis in original); *Hartsfield v. State*, 200 S.W.3d 813, 816 (Tex. App.—Texarkana 2006, pet. ref'd) ("On request, a special prosecutor assists a county attorney in the investigation and prosecution of a particular case."). A

---

[12] No issues regarding a memorandum of understanding were presented at trial.

[13] Another type of attorney that may prosecute criminal offenses is a "district attorney pro tem" who is "is *appointed by the district court*, and after taking the oath of office assumes the duties of the elected district attorney and in effect replaces the latter in performing germane functions of office for purposes contemplated by the appointment." *State v. Rosenbaum*, 852 S.W.2d 525, 529 (Tex. Crim. App. 1993) (Clinton, J., concurring) (en banc) (emphasis in original); *Coleman v. State*, 246 S.W.3d 76, 82 (Tex. Crim. App. 2008) ("attorney pro tem stands in the place of the regular attorney for the state and performs all the duties the state attorney would have performed under the terms of the appointment"); *see also* Tex. Code Crim. Proc. Ann. art. 2.07 ("Attorney Pro Tem"). The attorney pro tem, if not an attorney for the State, must take an oath of office. *Coleman*, 246 S.W.3d at 82 n.19.

special prosecutor is an attorney who is not part of the district attorney's office but who is enlisted to assist the district attorney in a particular case. *White v. State*, No. 02-12-00087-CR, 2013 WL 4210827, at *11 (Tex. App.—Fort Worth Aug. 15, 2013, no pet.) (per curiam) (mem. op., not designated for publication). "Court approval for a special prosecutor is not required because the ultimate responsibility for the special prosecutor's actions remains with the elected district attorney." *Coleman*, 246 S.W.3d at 82 n.19.

"Additionally, unlike a prosecutor, who is statutorily prohibited from appearing adversely to the State, a private attorney asked to serve as a special prosecutor is under no such prohibition." *In re Cox*, 481 S.W.3d 289, 293-94 (Tex. App.—Fort Worth 2015, orig. proceeding); *see* Tex. Code Crim. Proc. Ann. art. 2.08(a) ("District and county attorneys shall not be of counsel adversely to the State in any case, in any court, nor shall they, after they cease to be such officers, be of counsel adversely to the State in any case in which they have been of counsel for the State."). "Unlike a prosecutor in the district attorney's office whose position is constitutionally mandated and protected, the position of a special prosecutor enjoys no such constitutional underpinnings." *Cox*, 481 S.W.3d at 294. A private attorney appointed as a special prosecutor remains a private attorney. *Id.* Therefore, with a special prosecutor, the district attorney must retain control and responsibility for the prosecution. *Rosenbaum*, 852 S.W.2d at 529; *Villarreal v. State*, 504 S.W.3d 494, 504 (Tex. App.—Corpus Christi-Edinburg 2016, pet. ref'd); *Hartsfield*, 200 S.W.3d at 817.

## D. Analysis

"The rationale for requiring the district or county attorney to retain control of the prosecution [by a special prosecutor] is to assure that the interests of society in providing justice and a fair trial are not secondary to the interests of private parties who, in some cases, pay fees to special prosecutors." *Hartsfield*, 200 S.W.3d at 817. In a similar vein, as Jordan is operating

through the SPU, which, as explained above, is subject to the statutory supervisory structure of the SPU board of directors, its executive board, and presumably the chief of unit, she thus has "the same statutory duty to see that justice is done as does the [District] Attorney." *Id.*

In sum, we conclude that Cain, as the Madison County Criminal District Attorney, was not required to control or supervise the prosecution of Appellant's case by Jordan, who acted in her capacity as an SPU prosecutor. Accordingly, the trial court did not abuse its discretion by denying Appellant's motion for new trial and we overrule Appellant's first issue.

## IV. CONCLUSION

For the reasons stated above, we affirm the trial court's judgment.

LISA J. SOTO, Justice

January 31, 2025

Before Salas Mendoza C.J., Palafox and Soto, JJ.

(Do Not Publish)

17